UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

UMB BANK, N.A.,
                                        :

                Plaintiff,       :      ORAL ARGUMENT REQUESTED

                                          :

      v.                            :      Case No. 1:24-cv-8668 (JMF)

                                          :

BRISTOL-MYERS SQUIBB COMPANY
and EQUINITI TRUST COMPANY, LLC,    :

                                          :

                Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY DEFENDANT BRISTOL-MYERS SQUIBB COMPANY FOR LACK OF SUBJECT MATTER JURISDICTION AND FOR FAILURE TO STATE A CLAIM

John J. Clarke, Jr.
Jessica A. Masella
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
(212) 335-4500

Attorneys for Defendant
 Bristol-Myers Squibb Company

Dated:  January 14, 2025

Table of Contents

Page

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ....................................................................................................3

    A.    The Parties ...........................................................................................3

    B.    The CVRs.............................................................................................4

    C.    The Liso-cel Application and UMB's Allegations ...................................5

    D.    UMB's Previous Lawsuit........................................................................7

    E.    The DTC "Confirmation" and UMB's Second Action.............................8

APPLICABLE STANDARDS .................................................................................9

ARGUMENT ......................................................................................................10

I.    THIS ACTION SHOULD BE DISMISSED FOR LACK OF
SUBJECT MATTER JURISDICTION ..........................................................10

    A.    UMB Is Not the Trustee and Lacks Standing to Assert any Claim for
Breach of the CVR Agreement. ...........................................................10

        1.    Only the Trustee Can Sue for Breach of the CVR Agreement .................11

        2.    UMB Never Became the Trustee ...............................................................12

    B.    There Is No Independent Basis for Federal Jurisdiction Over UMB's
Declaratory Judgment Claim ...............................................................16

II.    IN THE ALTERNATIVE, THE COMPLAINT SHOULD BE DISMISSED
FOR FAILURE TO STATE A CLAIM ...........................................................19

    A.    The Trustee's Failure to Plead an Event of Default for Alleged Breach
of the Diligent Efforts Provision Requires Dismissal............................19

        1.    New York Law on Motions to Dismiss Breach of Contract Claims .........19

        2.    The Complaint Does Not Allege an "Event of Default"............................20

    B.    The Declaratory Judgment Claim Also Should Be Dismissed .............................23

CONCLUSION....................................................................................................24

Table of Authorities

Page(s)

Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................9

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*,
968 F.2d 196 (2d Cir. 1992).........................................................................................9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................9

*Blackrock Core Bond Portfolio v. U.S. Bank, N.A.*,
165 F. Supp. 3d 80 (S.D.N.Y. 2016)...................................................................12, 19

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
866 F. Supp. 2d 257 (S.D.N.Y. 2012).......................................................................20

*City of N.Y. v. Travelers Property Casualty Co.*,
2020 WL 263658 (S.D.N.Y. Jan. 16, 2020) .............................................................18

*Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*,
603 F.3d 169 (2d Cir. 2010)......................................................................................20

*Corresp. Servs. Corp. v. JVW Inv., Ltd.*,
2004 WL 2181087 (S.D.N.Y. Sept. 29, 2004),
*aff'd*, 442 F.3d 767 (2d Cir. 2006)......................................................................9, 17

*Corresp. Servs. Corp. v. First Equities Corp.*,
442 F.3d 767 (2d Cir. 2006)................................................................................16, 17

*Cortlandt St. Recovery Corp. v. Bonderman*,
31 N.Y.3d 30 (2018) ...............................................................................11, 12, 19, 20

*Cruden v. Bank of N.Y.*,
957 F.2d 961 (2d Cir. 1992)......................................................................................12

*Diesel Props. S.r.l. v. Greystone Bus. Cred. II LLC*,
631 F. 3d 42 (2d Cir. 2011).......................................................................................19

*Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*,
838 F.2d 66 (2d Cir. 1988)........................................................................................21

*Ex parte McCardle*,
74 U.S. 506 (1868).....................................................................................................10

Page(s)

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977).........................................................................................................17

*In re Taddeo*,
  685 F.2d 24 (2d Cir. 1982)..............................................................................................22

*Kaufman v. Eli Lilly & Co.*,
  65 N.Y.2d 449 (1985) .....................................................................................................12

*K. Bell & Assocs. v. Lloyd's Underwriters*,
  97 F.3d 632 (2d Cir. 1996)..............................................................................................20

*Kheel v. Port of N.Y.*,
  457 F.2d 46 (2d Cir. 1972)..............................................................................................17

*Kurz v. Holbrook*,
  989 A.2d 140 (Del. Ch. 2010),
  *aff'd in part, rev'd in part*, 992 A.2d 377 (Del. 2010)...........................................13

*Len v. Fuller*,
  1997 WL 305833 (Del. Ch. May 30, 1997) ..................................................................15

*Li v. Napolitano*,
  2009 WL 2358621 (S.D.N.Y. July 30, 2009) .................................................................9

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).........................................................................................................10

*Met. Life Ins. Co. v. RJR Nabisco, Inc.*,
  906 F.2d 884 (2d Cir. 1990)............................................................................................21

*Milberg LLP v. HWB Alexandra Strategies Portfolio*,
  2020 WL 3833829 (S.D.N.Y. July 8, 2020) ...................................................................9

*Nat'l Credit Union Admin. Bd. v. U.S. Bank, N.A.*,
  898 F.3d 243 (2d Cir. 2018)............................................................................................12

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
  392 F.3d 520 (2d Cir. 2004)............................................................................................19

*Olin Corp. v. Am. Home Assur. Co.*,
  704 F.3d 89 (2d Cir. 2012)..............................................................................................20

*Pabst Brewing Co. v. Jacobs*,
  549 F. Supp. 1068 (D. Del.),
  *aff'd mem.*, 707 F.2d 1392 (3d Cir. 1982) ...............................................................14

iii

Page(s)

*PaineWebber Inc. v. Bybyk,*
  81 F.3d 1193 (2d Cir. 1996)............................................................20

*Quadrant Structured Prods. Co. Ltd. v. Vertin,*
  23 N.Y.3d 549 (2014) .....................................................................11

*Semi-Tech Litig. LLC v. Bankers Tr. Co.,*
  353 F. Supp. 2d 460 (S.D.N.Y.),
  *aff'd on other grounds,* 450 F.3d 121 (2d Cir. 2005) ..........................21

*Sharkey v. Quarantillo,*
  541 F.3d 75 (2d Cir. 2008)................................................................9

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998)...........................................................................10

*St. Paul Mercury Indem. Co. v. Red Cab Co.,*
  303 U.S. 283 (1938).........................................................................18

*Svensson v. Securian Life Ins. Co.,*
  706 F. Supp. 2d 521 (S.D.N.Y. 2010)..............................................20

*Tongkook Am., Inc. v. Shipton Sportswear Co.,*
  14 F.3d 781 (2d Cir. 1994)..........................................................17, 18

*Tongue v. Sanofi,*
  816 F.3d 199 (2d Cir. 2016)...............................................................3

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021).......................................................................9, 10

*UMB Bank, N.A. v. Bristol-Myers Squibb Co.,*
  2022 WL 2290609 (S.D.N.Y. June 24, 2022) ................................ 21-22

*UMB Bank, N.A. v. Bristol-Myers Squibb Co.,*
  2024 WL 4355029 (S.D.N.Y. Sept. 30, 2024)............................... *passim*

*UMB Bank, N.A. v. Neiman Marcus Grp., Inc.,*
  128 N.Y.S.3d 823 (Sup. Ct. N.Y. Cty. 2020) ...................3, 11, 20, 21, 23

*United States v. Bond,*
  762 F.3d 255 (2d Cir. 2014)..............................................................10

*U.S. Bank, N.A. v. U.S. Timberlands Klamath Falls, L.L.C.,*
  2004 WL 1699057 (Del. Ch. July 29, 2004).....................3, 19, 20, 21, 23

Page(s)

*U.S. Bank N.A. v. Windstream Servs. LLC*,
2017 WL 5054726 (S.D.N.Y. Nov. 1, 2017) .......................................................................21

*Wallace v. 600 Partners Co.*,
86 N.Y.2d 543 (1995) ...................................................................................................20

### Constitution of the United States

Constitution of the United States, Article III, § 2 ....................................................... *passim*

### Statutes and Rules

28 U.S.C. § 1332 ...........................................................................................................2, 16

28 U.S.C. § 2201(a) ...........................................................................................................16

Fed. R. Civ. P. 12(b)(1) ..........................................................................1, 2, 3, 10, 24

Fed. R. Civ. P. 12(b)(6) ..........................................................................1, 2, 9, 19, 24

### Other Authorities

Am. Bar. Found., *Commentaries on Model Debenture Indenture Provisions* (1971) ............................................................................................ 11, 20-23

David Brooks, Comment, *Depository Trust Company and the Omnibus Proxy: Shareholder Voting in the Era of Share Immobilization*, 56 S. Tex. L. Rev. 205, 221-27 (2014) ...................................................................................................13

Defendant Bristol-Myers Squibb Company ("BMS") respectfully submits this memorandum of law in support of its motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This is the second lawsuit UMB Bank, N.A. ("UMB") has filed against BMS for an alleged breach of the Contingent Value Rights Agreement dated as of November 20, 2019 ("CVR Agreement").[1]  Its first action was dismissed for lack of subject matter jurisdiction because, the Court correctly found, UMB had not been appointed the trustee under the CVR Agreement by virtue of a December 2020 solicitation of consents from beneficial owners of the CVRs.  *See UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, No. 1:21-cv-04897 (JMF), 2024 WL 4355029 (S.D.N.Y. Sept. 30, 2024) ("*Dismissal Op.*").

UMB filed its latest complaint soon after its first case was dismissed, even while it took steps to appeal from the Court's dismissal ruling.  Its headlong rush to "pick up where [the first case] left off," Compl. ¶ 43, unnecessarily multiplies proceedings, wastes judicial resources, and gives rise to an avoidable risk of conflicting rulings.  Given the circumstances, the Court may wish to defer any ruling on this motion until the Second Circuit appeals have been resolved.  But if the Court proceeds, UMB's latest complaint should be dismissed for several reasons.

*First*, UMB still is not the trustee under the CVR Agreement because there has been no "act of the Majority Holders" to remove the original trustee, Equiniti Trust Company ("Equiniti"), and install UMB as its successor.  *See* CVR Agreement §§ 1.4(a), 4.10(c) & (e).  Since UMB is not the trustee, it does not have constitutional standing to assert claims against BMS for breach of

---

[1] A conformed copy of the CVR Agreement, in the form in which it was filed as an exhibit to Form 8-K on November 20, 2019, is attached as Exhibit A to the complaint.

the CVR Agreement, and that requires dismissal of the breach of contract claim UMB has asserted under Rule 12(b)(1).

In its new complaint, UMB acknowledges the Court's conclusion that it did not replace Equiniti as trustee under the CVR Agreement in December 2020.  Compl. ¶ 43.  The complaint now contends the defects in the 2020 effort to change the trustee were cured through proxies collected *in 2024* from Cede & Co., as nominee for The Depository Trust Company ("DTC"), which was the registered Holder for those CVRs.  Compl. ¶ 27.  According to the complaint, those newly gathered DTC proxies transform the defective and ineffective efforts in December 2020 into an "act of the Majority Holders" sufficient to change the trustee *in 2024*.  *Id.* ¶¶ 27-28, 38-42.  But the CVR Agreement does not permit defects in a consent solicitation to be corrected *three years after the fact*.  The earlier investor signatures expired no later than 120 days after December 18, 2020, when the "Instrument" purporting to install UMB as the trustee was delivered to BMS.  Proxies signed by DTC in 2024 could not validly relate to that earlier "record date."  *See* CVR Agreement § 1.4(a).

*Second*, the Court also lacks subject matter jurisdiction over UMB's declaratory judgment claim because it has not alleged the amount-in-controversy required for diversity jurisdiction without relying on its breach of contract claim, which it does not have standing to assert.  28 U.S.C. § 1332(a); *see* Compl. ¶ 29.  The object of the declaratory judgment claim is not whether BMS breached the CVR Agreement but instead whether UMB or Equiniti is the trustee.  There is no allegation of any value associated with that question, because there is none.  *See* Compl. ¶¶ 122-24. Either entity would be in the same position to pursue a breach of contract claim against BMS if determined to be the trustee.

*Finally*, in the alternative, the complaint should be dismissed under Rule 12(b)(6) for failure to state a claim because there has been no "Event of Default" that would permit UMB to

sue BMS for an alleged breach of the covenant to "use Diligent Efforts to achieve the Milestone." *See* Compl. ¶¶ 125-133; *see* CVR Agreement § 7.8. The CVR Agreement only permits such a claim if an alleged breach continues for ***ninety days*** after BMS receives a written notice "specifying" the breach and "requiring it to be remedied." CVR Agreement § 8.1(b). UMB purported to send a notice letter on October 21, 2024, but it filed this lawsuit only ***twenty-four days*** later.[2] *See* Compl. ¶ 121.

The alleged breach of BMS's covenant to use "Diligent Efforts" therefore never became an "Event of Default" that would permit this lawsuit – even if UMB were now the trustee (which it is not). CVR Agreement §§ 8.1(b), 8.4; *see U.S. Bank, N.A. v. U.S. Timberlands Klamath Falls, L.L.C.*, 2004 WL 1699057, at *3 (Del. Ch. July 29, 2004) ("without an Event of Default, the Trustee has no power to bring any claim."); *UMB Bank, N.A. v. Neiman Marcus Grp., Inc.*, 128 N.Y.S.3d 823, 827 (Sup. Ct. N.Y. Cty. 2020) (same).

**BACKGROUND**[3]

### A.    The Parties

UMB is a national bank based in Missouri that alleges it is the trustee under the CVR Agreement. Compl. ¶ 47. BMS is a global biopharmaceutical company incorporated in Delaware with its principal place of business in New Jersey. *Id.* ¶ 48. Equiniti Trust Company,

---

[2] The complaint refers to an earlier "notice" letter sent on March 4, 2021, *id.* ¶ 120, but that letter could not be a "Notice of Default" because UMB was not the trustee at that time, as the Court already found. *Dismissal Op.* at *1; *see* CVR Agreement § 8.1(b).

[3] Well pleaded factual allegations are assumed to be true solely for the purpose of this motion to dismiss. *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016). "The Court may also 'consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff upon which it relied in bringing the suit.'" *Id.* (citation omitted). On a motion under Rule 12(b)(1), courts may consider additional materials, as discussed below. *See infra* at 9.

LLC, the successor to Equiniti, is a New York limited liability company beneficially owned by citizens of New York and Delaware. *Id.* ¶ 49.

**B.    The CVRs**

On January 3, 2019, BMS and Celgene announced they had entered into a merger agreement under which BMS would acquire Celgene for consideration consisting of $50 in cash, one share of BMS common stock, and one publicly traded CVR in exchange for each share of Celgene common stock. *Id.* ¶ 58.

Contingent value rights are complex securities sometimes used in mergers to bridge valuation gaps relating to uncertain future events. *Id.* ¶ 51. Here, the uncertain events that were contingencies to payment were future approval decisions by the FDA of three Celgene product candidates. Each of the CVRs to be issued in the merger would represent a contingent right to payment of $9 in the future, but only if the FDA approved applications for three "milestone therapies" by their contractual milestone dates: (i) liso-cel, a chimeric antigen receptor therapy (CAR-T) for treatment of lymphoma; (ii) ozanimod, a drug for treatment of relapsing multiple sclerosis; and (iii) ide-cel, another CAR-T therapy, for treatment of multiple myeloma. *Id.* ¶¶ 3, 53. The milestone date for liso-cel and ozanimod was December 31, 2020; the milestone date for ide-cel was March 31, 2021. *Id.* ¶ 54. If the FDA failed to approve any one of the three applications by its milestone date, the CVR Agreement would terminate automatically and the CVRs would expire without value. *Id.* ¶ 3; *Dismissal Op.* at *1.

The stockholders of BMS and Celgene approved the proposed merger at meetings held in April 2019, but the closing did not occur for seven more months. *Id.* ¶¶ 59, 60. Upon the closing on November 20, 2019, BMS entered into the CVR Agreement with Equiniti, as trustee. *Id.* ¶ 60. The CVRs then began trading on the New York Stock Exchange.

The FDA ultimately approved ozanimod and ide-cel before their milestone dates. *Id.* ¶ 23. The FDA also approved the biologics license application for liso-cel, but it did not issue that decision until February 5, 2021 – five weeks after the milestone date under the CVR Agreement. *Id.* ¶¶ 20, 101. When the milestone date passed without an FDA decision, the CVR Agreement terminated automatically and the CVRs expired without value, which BMS reported in a press release issued on January 1, 2021. *Id.* ¶¶ 17, 108.

### C.      The Liso-cel Application and UMB's Allegations

The complaint alleges BMS breached section 7.8 of the CVR Agreement by allegedly failing to "use Diligent Efforts to achieve the Liso-cel Milestone," pointing to alleged developments in the FDA approval process during 2020. *Id.* ¶ 127. Without addressing the significant impact on FDA operations that arose from the worst pandemic in a century, UMB contends that if BMS had used Diligent Efforts "it would have avoided much more than thirty-six days of delay" in obtaining FDA approval for liso-cel. *Id.* ¶ 20.

Both liso-cel and ide-cel are CAR-T therapies, which are complex biological drugs that treat cancer using a patient's own genetically modified T-cells. *Id.* ¶ 61. When BMS and Celgene entered into the merger agreement, the FDA had approved only two CAR-T therapies. *Id.* ¶ 62. At the time, the FDA recognized the "complexities associated with manufacturing these products in a safe, reliable and cost-effective way," and it therefore was developing guidance for future applicants. But even the first draft of that guidance was not issued until a year after liso-cel and ide-cel were approved. *See* FDA Statement dated Jan. 15, 2019, "*Statement on new policies to advance development of safe and effective cell and gene therapies*"; FDA Draft Guidance, "*Considerations for the Development of [CAR-T] Products*," 87 Fed. Reg. 14893 (Mar. 16, 2022).

On September 30, 2019, before the merger closing, Celgene filed the first component of the rolling application for U.S. marketing approval of liso-cel with the FDA. *Id.* ¶ 68. On

December 18, 2019, a few weeks after the closing, BMS submitted the final section, addressing Chemistry, Manufacturing, and Controls (CMC). *Id.* In direct conflict with UMB's allegation that the filing did not include "critical and mandatory information," *id.* ¶ 7, the FDA accepted the application and designated it for "Priority Review," meaning the agency had only six months, instead of ten, to reach a final decision under the Prescription Drug User Fee Act of 1995, as amended ("PDUFA"). *Id.* ¶¶ 69, 70.

Soon after the FDA accepted the liso-cel filing, the FDA announced a significant curtailment of its operations because the COVID-19 pandemic had become a national emergency; this included dramatic reductions in the number of facility inspections that could be conducted by FDA staff. *Id.* ¶ 84; *see* FDA Statement, "*Coronavirus (COVID-19) Update: FDA Focuses on Safety of Regulated Products While Scaling Back Domestic Inspections*," Mar. 18, 2020.

On March 23, 2020, not long after that FDA announcement, the FDA issued an information request to BMS seeking supporting "data on assays and validation" relating to the CMC module of the liso-cel application. Weeks after BMS provided the requested information, the complaint alleges, the FDA concluded the data was so substantial that it constituted a "major amendment" to the application, which "automatically triggered a three-month extension of the PDUFA date" for liso-cel from August 17, 2020 to November 16, 2020, which was still "weeks *before* the December 31, 2020" milestone date. *Id.* ¶ 75 (emphasis added).[4] BMS promptly disclosed this development. *Id.* ¶ 78.

UMB alleges that BMS later "failed to take the steps necessary to prepare two [l]iso-cel manufacturing facilities for the FDA's inspections." *Id.* ¶ 9. The complaint acknowledges the pandemic caused the FDA to postpone the inspections until "later in 2020," *id.* ¶¶ 84-85, and a

---

[4] The extended PDUFA date also was still *a month earlier* than if the FDA had determined not to designate the liso-cel application for "Priority Review." *See id.* ¶ 70.

contract manufacturing facility owned by a subsidiary of Lonza AG was not inspected until December 3-10, 2020, which was *after* the extended PDUFA date, *id.* ¶¶ 11, 91.  However, the agency ultimately completed both inspections, and BMS addressed FDA comments arising from them, *before* the liso-cel milestone date.  *Id.* ¶¶ 10, 11, 87, 89, 91, 94.

In a press release issued on January 1, 2021, BMS reported that the FDA had not issued a decision on the liso-cel application by the milestone date the day before; as a result, the CVR Agreement had terminated by its terms and the CVRs were "no longer eligible for payment[.]"  Compl. ¶¶ 17, 108.  Five weeks later, on February 5, 2021, the FDA approved the liso-cel application.  *Id.* ¶¶ 20, 101.

### D.    UMB's Previous Lawsuit

In anticipation of litigation against BMS if the FDA did not approve liso-cel by the milestone date, hedge fund investors recruited UMB to step in as trustee because it was perceived "to be better suited to bring litigation[.]"  *Dismissal Op.* at *3; *see* Compl. ¶ 13.  On December 18, 2020, UMB delivered a document to BMS and Equiniti labelled an "Instrument of Removal, Appointment and Acceptance," which purported to reflect an "act of the Majority Holders" under the CVR Agreement to remove Equiniti, and appoint UMB, as the trustee.  *Id.*; *see* Compl. Exh. D.

On March 4, 2021, as a precursor to filing a lawsuit, UMB sent BMS a letter asserting that BMS had breached its covenant to use "Diligent Efforts" to achieve the liso-cel milestone.  *Id.* ¶ 120.  There had been no attempt to send a notice letter before the CVR Agreement terminated, including after BMS disclosed the FDA's "major amendment" letter for liso-cel on May 5, 2020, which UMB asserts is a "rare" occurrence.  *Id.* ¶ 76.  Ninety days after the March 2021 notice letter, UMB filed a complaint against BMS, "solely in its capacity as Trustee," in which it asserted claims for breach of the CVR Agreement.  *Id.* ¶¶ 35, 120; *see Dismissal Op.* at *4.

7

After discovery confirmed UMB had not obtained DTC's written authorization for the "Instrument," which was the alleged "act of the Majority Holders" by which UMB purported to replace Equiniti as the trustee, BMS filed a motion to dismiss for lack of subject matter jurisdiction. *Dismissal Op.* at *4. This Court granted the motion in an opinion issued on September 30, 2020, finding that "UMB was not properly appointed Trustee prior to filing suit and that this defect compels dismissal for lack of subject matter jurisdiction." *Id.* at *1. UMB appealed from that decision. Its opening brief on appeal is due by February 11, 2025. *UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, Case No. 24-2865 (2d Cir.), ECF No. 19.1. BMS cross-appealed to the extent the Court's interlocutory opinion in June 2022, denying BMS's motion to dismiss for failure to state a claim, was merged into the judgment. *UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, Case No. 24-2928 (2d Cir.).

### E.    The DTC "Confirmation" and UMB's Second Action

UMB alleges that during the briefing of BMS's subject matter jurisdiction motion in early 2024, "CVR holders obtained proxies from Cede & Co., the DTC's nominee and the registered Holder for those holders' CVRs, which confirm UMB's replacement of Equiniti as Trustee in December 2020." Compl. ¶ 27. UMB contends that the alleged DTC "Confirmation is effective and UMB now asserts its same claims against [BMS] anew." *Id.* ¶ 28.

Before filing suit, on October 21, 2024, UMB sent BMS a pre-suit letter purporting to provide notice of a breach of BMS's covenant in section 7.8 of the CVR Agreement to use Diligent Efforts to obtain timely FDA approval of liso-cel. *Id.* ¶ 121. It filed its complaint in this action 24 days later. UMB asserts a claim against BMS for breach of the CVR Agreement, *id.* ¶¶ 125-33, and a second claim, against BMS and Equiniti, seeking a declaratory judgment that UMB, not the new Equiniti, is the trustee under the CVR Agreement, *id.* ¶¶ 122-24.

## APPLICABLE STANDARDS

"On a motion to dismiss for lack of subject matter jurisdiction, the court must accept the material factual allegations contained in the complaint." *Correspondent Servs. Corp. v. JVW Inv., Ltd.,* 2004 WL 2181087, at *6 (S.D.N.Y. Sept. 29, 2004), *aff'd*, 442 F.3d 767 (2d Cir. 2006) (*per curiam*). But "where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings . . . to determine whether jurisdiction exists." *Li v. Napolitano*, 2009 WL 2358621, at *1 (S.D.N.Y. July 30, 2009).

"The party invoking federal jurisdiction bears the burden of establishing that jurisdiction exists." *Milberg LLP v. HWB Alexandra Strategies Portfolio*, 2020 WL 3833829, at *2 (S.D.N.Y. July 8, 2020) (citation omitted); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021) (same). In determining the question, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008) (citation omitted). Nor can a plaintiff satisfy its burden through pleading inferences. *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992).

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim is one that enables the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## ARGUMENT

## I. THIS ACTION SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

"Subject matter jurisdiction is a 'threshold question that must be resolved . . . before proceeding to the merits.'" *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (citation omitted). "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)). This action should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) for two reasons: first, UMB does not have Article III standing to assert its breach of contract claim because it is not the trustee under the CVR Agreement; and second, there is no independent basis for federal subject matter jurisdiction over UMB's declaratory judgment claim.

### A. UMB Is Not the Trustee and Lacks Standing to Assert any Claim for Breach of the CVR Agreement.

UMB alleges it filed this action "solely in its capacity" as the trustee under the CVR Agreement, Compl. at 1; *id.* ¶ 30, but UMB is not the trustee and still does not have standing to assert its breach of contract claim.[5] *Dismissal Op.* at *11 (because it was not the trustee in June 2021, UMB had "no justiciable claim against BMS when it filed suit"); *see TransUnion*, 594 U.S. at 423 ("For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (standing requires "injury in fact," a "causal connection" between that injury and the conduct at issue, and redressability).

---

[5] UMB previously conceded it suffered no personal injury. *Dismissal Op.* at *5.

### 1. Only the Trustee Can Sue for Breach of the CVR Agreement.

The CVR Agreement is an indenture subject to the provisions of the Trust Indenture Act.[6]

"An indenture is essentially a written agreement that bestows legal title of the securities in a single

[t]rustee to protect the interests of individual investors who may be numerous or unknown to each

other." *Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 39 (2018) (quoting *Quadrant*

*Structured Prods. Co. Ltd. v. Vertin*, 23 N.Y.3d 549, 555 (2014)).  As a "stakeholder," the duties

and obligations of an indenture trustee "'are exclusively defined by the terms of the indenture.'"

*Neiman Marcus*, 128 N.Y.S.3d at 826 (quoting *Bonderman*, 31 N.Y.3d at 39).

As UMB previously conceded, "'only a properly appointed Trustee would have standing

to bring' this lawsuit."  *Dismissal Op.* at *5 (quoting transcript).  That is clear from the plain

language of the CVR Agreement.  *See* CVR Agreement § 8.1 ("If an Event of Default described

above occurs and is continuing . . . the Trustee . . . shall bring suit . . ."); § 8.4 ("In case an Event

of Default has occurred . . . the Trustee may . . . enforce its rights and the rights of the Holders

under this CVR Agreement by such appropriate judicial proceedings as the Trustee shall deem

most effectual . . .").  With limited exceptions not applicable here, Holders are barred from suing

for alleged breaches of the agreement.  *Id.* § 8.6.

These limitations are customary.  They "make[] it more difficult for individual [security

holders] to bring suits" when the majority might be opposed and "ensure that the proceeds of any

litigation actually prosecuted will be shared ratably by all [holders]."  *Bonderman*, 31 N.Y.3d at

43-44 (quoting *Quadrant Structured Prods.*, 23 N.Y.3d at 566); *see* Am. Bar. Found.,

*Commentaries on Model Debenture Indenture Provisions* (1971) ("Commentaries"), §§ 5-3, 5-7.

---

[6] *See* CVR Agreement §§ 1.1(c), 1.7, 4.3, 4.8, 4.9, 4.13, 5.2(b), 5.3(a), 6.1(f), 6.5, 8.11.

2.    **UMB Never Became the Trustee.**

The unambiguous provisions of the CVR Agreement also control in determining whether Equiniti was removed as trustee and UMB was appointed as its successor.  *Dismissal Op.* at *6; *Bonderman*, 31 N.Y.3d at 39; *see Nat'l Credit Union Admin. Bd. v. U.S. Bank, N.A.*, 898 F.3d 243, 255 (2d Cir. 2018) ("New York law requires that we give effect to the plain meaning of the Indenture Agreements' unambiguous terms"); *Blackrock Core Bond Portfolio v. U.S. Bank, N.A.*, 165 F. Supp. 3d 80, 97 (S.D.N.Y. 2016) ("a trust indenture is a contract, and the court must interpret a written contract 'so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed'") (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)).

The Court's dismissal opinion and the ensuing judgment conclusively establish that UMB did not replace Equiniti as trustee by an "act of the Majority Holders" in December 2020 because DTC, as the registered Holder, did not authorize that action in writing or provide its proxy. *Dismissal Op.* at *6; *see Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455 (1985) (doctrine of collateral estoppel precludes a party from relitigating an issue previously decided against it in a proceeding in which it had opportunity to litigate the point).  The Court was correct in reaching that conclusion, for the reasons set forth in its opinion.  *See Dismissal Op.* at *5-6.

As the Court observed, the trustee may be removed under the CVR Agreement, and a successor trustee may be appointed, by an "act of the Majority Holders."   CVR Agreement §§ 4.10(c), (e); *see Dismissal Op.* at *2-3, 6.  But the "Instrument of Removal, Appointment and Acceptance" that UMB delivered to BMS and Equiniti on December 18, 2020, *see* Compl. ¶ 32; *id.* Exh. D, was not "an act of the Majority Holders," because it was supported only by signatures from beneficial owners of the CVRs that were not authorized by the registered Holder of their

securities – DTC, through its nominee Cede & Co., *Dismissal Op.* at *5; *see* CVR Agreement § 1.4(a).

Under the CVR Agreement, "Holder" means "a Person in whose name a Security is registered in the Security Register," and "Majority Holders" means "Holders of at least a majority of the Outstanding CVRs." *Dismissal Op.* at *3 (discussing CVR Agreement § 1.1). DTC, through Cede & Co., was the registered Holder of CVRs traded on the NYSE. *Dismissal Op.* at *5; CVR Agreement § 3.5(b).[7] Section 1.4 of the CVR Agreement, in turn, governs "Acts of Holders" and provides that such acts "may be embodied in and evidenced by one or more instruments . . . signed by *such Holders* in person *or by an agent duly appointed in writing*," as of a record date established in accordance with the provision. CVR Agreement § 1.4(a) (emphasis added); *see Dismissal Op.* at *3. An instrument that has not been signed or authorized by registered Holders cannot be an "act of the Majority Holders" and cannot result in a change in trustees under sections 4.10(c) and (e) of the CVR Agreement.

Just as it required dismissal of UMB's first lawsuit, the CVR Agreement also precludes UMB's current contention that "Cede & Co.'s purported *post hoc* approval effectively installed UMB as successor Trustee." *Dismissal Op.* at *12. The Court did not need to reach that question to hold that there was no subject matter jurisdiction over UMB's previous case.[8] *Id.* But for several

---

[7] *See Kurz v. Holbrook*, 989 A.2d 140, 147-48 (Del. Ch. 2010) (discussing DTC book-entry securities trading system), *aff'd in part, rev'd in part*, 992 A.2d 377 (Del. 2010); *see generally* David Brooks, Comment, *Depository Trust Company and the Omnibus Proxy: Shareholder Voting in the Era of Share Immobilization*, 56 S. Tex. L. Rev. 205, 221-27 (2014).

[8] In contrast, the Second Circuit would need to address the question – and agree with UMB's mistaken argument – in order to reverse the dismissal ruling on appeal. Only if it reached that conclusion could the appellate court rule that the 2024 proxies from Cede & Co. were sufficient to retroactively correct the defect in jurisdiction when UMB filed its first complaint.

reasons, the retroactive DTC proxies did not cure the defective consents delivered in December 2020.

*First*, under the CVR Agreement, the effectiveness of beneficial owner signatures compiled in the "Instrument" for the purpose of installing UMB as trustee lapsed by no later than ***April 17, 2021***, which was "one hundred twenty (120) days" after the "record date" of December 18, 2020 – the date when the Instrument was delivered to BMS.  *See* CVR Agreement § 1.4(a) ("No such vote or consent shall be valid or effective for more than one hundred twenty (120) days after such record date.").  The beneficial owner signatures became stale by that date and could not be validated by DTC proxies obtained more than three years later.  Staleness of consents is a well recognized principle in securities law.  *See*, *e.g.*, *Pabst Brewing Co. v. Jacobs*, 549 F. Supp. 1068, 1073 (D. Del.), *aff'd mem.*, 707 F.2d 1392 (3d Cir. 1982) (solicitation was misleading in stating that consents would be valid for over seven months when Delaware law limited duration of validity to 60 days).[9]

*Second*, any delivery of DTC consents in 2024 would establish a new and different "record date" under the CVR Agreement based on the date of that delivery.  *See* CVR Agreement § 1.4(a) ("If not previously set by the Company . . . the record date for determining the Holders entitled to consent to any action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company.").  DTC consents delivered on a record date in 2024 would need to relate to CVRs owned on that new date, not on a date in December 2020.  *See* CVR Agreement § 1.4(a) ("If a record date is fixed, those Persons who were Holders of Securities at such record date (*or their duly designated proxies*), and

---

[9] The signatures in the "Instrument" purportedly were dated "as of" December 9, 2020. Compl. Exh. D (copy of the "Instrument").  There was no attempt in 2020 to collect investor signatures "as of" December 18, 2020, Compl. ¶ 32; *see Dismissal Op.* at *3, but even if there had been those signatures would have become invalid for the same reason.

only those Persons, shall be entitled to take such action by vote or consent . . .") (emphasis added).[10]

*Third*, the CVR Agreement terminated automatically on January 1, 2021, when the liso-cel milestone date passed without an FDA decision on the application. *See* CVR Agreement § 1.16; Compl. ¶ 17. Voting rights that previously accompanied the CVRs expired with the securities, and DTC could not retroactively authorize a purported action by beneficial owners from before the termination date. *See Len v. Fuller*, 1997 WL 305833, at *3 (Del. Ch. May 30, 1997) (Allen, C.) (seller of stock divests itself of equitable right "to compel a proxy from the registered owner or, more directly, to have its vote counted by the court in an election contest").

*Finally*, even if these contractual issues were not dispositive (and they are), UMB has not shown an "act" by a "majority of Holders" through beneficial owner signatures for whom DTC retroactively provided its proxy. UMB alleges it has retroactive proxies from DTC with respect to "392,525,875 CVRs . . . as of December 9, 2020," the "effective" date UMB used in the "Instrument." Compl. ¶ 40; *see id.* Exh. D.[11] But that includes 41,478,639 CVRs owned by investors who did not sign the "Instrument" in December 2020.[12] Subtracting those reduces the total below a majority (even using UMB's denominator). Similarly, the retroactive DTC proxies reveal that the "Instrument" overstated the holdings of several CVR investors as of December 9,

---

[10] The materials submitted with the complaint only purport to reflect actions by investors who owned CVRs in December 2020 and not at any other time. *See* Compl. Exhs. D, E, G, H & I.

[11] The complaint alleges there also are retroactive DTC proxies for "394,630,734 CVRs . . . as of December 18, 2020." Compl. ¶ 41. But there was no effort in 2020 to collect beneficial owner signatures for that date, so there is no defect to even attempt to cure. Moreover, the same deficiencies exist for the materials dated "as of" that date as for those dated "as of" December 9, 2020, as shown by the materials attached to the complaint. *See* Compl. Exh. H.

[12] *See* Compl. Exh. G (CVRs beneficially owned by ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

2020, which means there was an additional overstatement of 27,589,516 CVRs in the figure alleged by UMB. That error also reduces the total below a majority (using UMB's denominator).[13]

### B. There Is No Independent Basis for Federal Jurisdiction Over UMB's Declaratory Judgment Claim.

There also is no subject matter jurisdiction over Count I of the complaint, in which the only relief UMB seeks is a declaratory judgment that it is the trustee under the CVR Agreement and that Equiniti no longer is the trustee. Compl. ¶¶ 122-24. That claim does not satisfy the minimum amount in controversy required for diversity jurisdiction, *see* 28 U.S.C. § 1332(a) ($75,000 amount in controversy), and UMB cannot rely on allegations concerning the amount-in-controversy for its breach of contract claim because it does not have constitutional standing to assert that claim for the reasons already discussed.

"[T]he Declaratory Judgment Act does not by itself confer subject matter jurisdiction on the federal courts. Rather, there must be an independent basis of jurisdiction before a district court may issue a declaratory judgment." *Correspondent Servs. Corp. v. First Equities Corp.*, 442 F.3d 767, 769 (2d Cir. 2006) (*per curiam*); *see* 28 U.S.C. § 2201(a) ("In a case of actual controversy *within its jurisdiction*," a federal court may declare "rights and other legal relations of any interested party seeking such declaration") (emphasis added). UMB alleges federal jurisdiction based on diversity of citizenship. Compl. ¶¶ 29, 47-49.

Without the breach of contract claim, UMB has not alleged an amount-in-controversy greater than $75,000. To the contrary, there is no value ascribed to the declaratory judgment claim in the complaint. *See* Compl. ¶¶ 122-24. The only value mentioned in the complaint relates

---

[13] These investors and the December 2020 overstatement are: ███████████████
████████████████████████████████████████████████████████████████████████████████
████████████████ .

exclusively to the breach of contract claim that UMB does not have standing to assert.  *See* Compl.

¶ 1 (alleging UMB "seeks to hold [BMS] accountable" for failing to use "Diligent Efforts" to

secure FDA approval of liso-cel therefore "eliminating its $6.7 billion liability") & "Prayer for

Relief" (seeking "award of monetary damages in an amount to be proven at trial *on Count II*")

(emphasis added).

"In actions seeking declaratory . . . relief, it is well established that the amount in

controversy is measured by the value of *the object* of the litigation."  *Hunt v. Wash. State Apple

Adver. Comm'n*, 432 U.S. 333, 347 (1977) (emphasis added).[14]  When damages are not requested,

courts evaluate the plaintiff's allegations to determine "the value of the right being protected or

the injury being averted . . . ."  *Corresp. Servs. Corp.*, 442 F.3d at 769 (quoting *Kheel v. Port of

N.Y.*, 457 F.2d 46, 49 (2d Cir. 1972)).

But mere mention of large potential liabilities in a complaint is not determinative.  For

example, in *Correspondent Services Corp. v. JVW Inv., Ltd.*, a clearing agency (CSC) sought a

declaratory judgment concerning the ownership of a certificate of deposit entrusted to it based on

an allegation that it "ha[d] been threatened with claims . . . in excess of ten million dollars . . . [if]

it transferred the CD to anyone but Kelleher[.]"  2004 WL 2181087 at *2.  All parties agreed that

by the time of the complaint, the CD had expired and had no value.  *Id.* at *3.  The defendants

argued that the "object" of the claim was a finding that CSC had no liability, but Judge Sweet

disagreed, holding that "the object of the litigation is the CD" based on the allegations of the

complaint and, since it had no value when the suit was filed, the amount in controversy was not

met.  *Id.* at *9.  The Second Circuit affirmed.  442 F.3d at 769-70.

---

[14] The amount in controversy is determined based on facts as they existed when the action
was filed.  *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994).

Similarly, in *City of N.Y. v. Travelers Property Casualty Co.*, 2020 WL 263658 (S.D.N.Y. Jan. 16, 2020), New York City sought a declaratory judgment that insurers owed a duty to defend several tort suits, but it did not allege that the value of the defenses were sufficient to meet the amount-in-controversy requirement.  Judge Nathan dismissed the action for lack of subject matter jurisdiction, rejecting the City's argument that it faced a significant loss under the indemnity provisions of the same policies if it lost the duty to defend claim.  Even if so, "the collateral effects a decree or judgment might have . . . cannot be taken into account in calculating the amount in controversy."  *Id.* at *2 (citations omitted).

The allegations of the complaint in this case make it clear that the "object" of UMB's declaratory judgment claim is only a determination of the identity of the trustee under the CVR Agreement.  Compl. ¶¶ 122-24.  There is no value inherent to that determination, nor does the complaint allege there is any value to it.  *See id.*  The issue does not implicate the potential damages that might be recovered from BMS for an alleged breach of contract.  Indeed, whichever entity might be determined to be the trustee would be similarly situated to assert such a claim.  The amount-in-controversy for Count I of the complaint therefore is $0, requiring dismissal for lack of subject matter jurisdiction.[15]

---

[15] In addition, for the reasons discussed in the next section, the Court can determine "to a legal certainty," and "from the face of the" complaint, that UMB had no actionable breach of contract claim when it filed the complaint because there was no "Event of Default" as of that date. *Tongkook Am.*, 14 F.3d at 784 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)).  The amount in controversy therefore is also $0 for that claim.

## II.    IN THE ALTERNATIVE, THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Even if there were subject matter jurisdiction, the complaint should be dismissed for failure to state a claim under Rule 12(b)(6).

### A.    The Trustee's Failure to Plead an Event of Default for Alleged Breach of the Diligent Efforts Provision Requires Dismissal.

UMB did not comply with the pre-suit notice requirement in section 8.1(b) of the CVR Agreement before filing suit, and there is no "Event of Default" that would empower any trustee to file suit for a breach of the agreement.  *See* CVR Agreement § 8.1(b) ("Event of Default" for alleged breach of non-payment covenants); *U.S. Timberlands*, 2004 WL 1699057, at *3; *Neiman Marcus*, 128 N.Y.S.3d at 827.

### 1.    New York Law on Motions to Dismiss Breach of Contract Claims.

"[A] trust indenture is a contract" that must be interpreted "to give effect to the intention of the parties as expressed in [its] unequivocal language[.]"  *Blackrock Core Bond Portfolio*, 165 F. Supp. 3d at 97; *see Bonderman*, 31 N.Y.3d at 39 (indenture "bestows legal title" in the trustee to protect interests of individual investors).  To recover for breach of contract under New York law, a plaintiff must establish "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."  *Diesel Props. S.r.l. v. Greystone Bus. Cred. II LLC*, 631 F. 3d 42, 52 (2d Cir. 2011); *see Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("[c]ausation is an essential element of damages in a breach of contract action").[16]

---

[16] The CVR Agreement is governed by New York law.  CVR Agreement, § 1.10; Compl. ¶ 46.

"[T]he initial interpretation of a contract 'is a matter of law for the court to decide[.]'" *Svensson v. Securian Life Ins. Co.*, 706 F. Supp. 2d 521, 525 (S.D.N.Y. 2010) (quoting *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)). The goal in that analysis is "to give effect to the intention of the parties as expressed in the unequivocal language employed." *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 269 (S.D.N.Y. 2012) (quoting *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548 (1995)).

Whether a "contract is unambiguous is a question of law for the court." *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010). A contract is unambiguous where it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012). When a contract is unambiguous, a court may resolve a claim for breach of contract on a motion to dismiss. *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996).

### 2.  The Complaint Does Not Allege an "Event of Default"

An indenture both defines and limits the role of an indenture trustee. *Bonderman*, 31 N.Y.3d at 39-40. To that end, sections 8.1 and 8.4 of the CVR Agreement make clear that the trustee cannot bring suit for breach unless and until there has been an "Event of Default." CVR Agreement §§ 8.1, 8.4; *see Neiman Marcus*, 128 N.Y.S.3d at 826 (dismissing fraudulent transfer complaint filed by UMB because there was no Event of Default); *U.S. Timberlands*, 2004 WL 1699057, at *3 (dismissing breach of contract complaint for same reason, applying New York law). There has not been an "Event of Default" here.

Under the CVR Agreement, as with other trust indentures, non-payment breaches "are not automatic events of default but may become events of default after formal written notice is given to the Company and the default *continues for a grace period* after such notice." *Commentaries*,

§ 5-1(3) at 207 (emphasis added).    The CVR Agreement includes language virtually indistinguishable from the model provision in the *Commentaries*.  It provides that a non-payment covenant "default" does not become an "Event of Default" unless BMS's "material default in the performance" of such a covenant continues for ninety days *after* BMS has received a written "Notice of Default" "specifying" the default and "requiring it to be remedied[.]"  *Id.* § 8.1(b); *see* Commentaries, § 5-1(3).[17]

The distinction between a "default" and an "Event of Default" is common in trust indentures and is well recognized by the courts.  *Neiman Marcus*, 128 N.Y.S.3d at 827; *U.S. Timberlands*, 2004 WL 1699057, at *3; *see Met. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 890-91 (2d Cir. 1990) (reversing preliminary injunction that extended grace period to prevent default from becoming Event of Default); *U.S. Bank N.A. v. Windstream Servs. LLC*, 2017 WL 5054726 (S.D.N.Y. Nov. 1, 2017) (Furman, J.) (tolling "60-day cure period" to defer occurrence of "Event of Default" to allow limited discovery in litigation over alleged default).

Further, the 90-day grace period is an important contract right.  It allows an issuer the opportunity to avoid litigation by correcting an identified covenant default before a trustee or holders have any right to sue.  *See In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982) ("Curing a default commonly means taking care of the triggering event and returning to pre-default conditions.  The consequences are thus nullified."); *Commentaries*, § 5-1 at 207. [18]

---

[17] Courts applying New York law have looked to the *Commentaries* in cases involving disputes arising under trust indentures.  *See, e.g., Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 71-72 (2d Cir. 1988) (discussing indenture provisions concerning notice of redemption); *Semi-Tech Litig. LLC v. Bankers Tr. Co.*, 353 F. Supp. 2d 460, 474-78 (S.D.N.Y.) (discussing trustee duties), *aff'd on other grounds*, 450 F.3d 121 (2d Cir. 2005).

[18] In the previous action, the Court held that a "Notice of Default" for alleged breach of the covenant to use "Diligent Efforts" could mature into an "Event of Default" with the passage of ninety days even if the notice letter was not sent until after the CVR Agreement terminated.  *See UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, 2022 WL 2290609 (S.D.N.Y. June 24, 2022).  BMS respectfully disagrees and has cross-appealed to the Second Circuit on that issue.  Respectfully, no

UMB did not comply with the pre-suit notice requirement and cannot sue because there has been no "Event of Default" under the plain language of the CVR Agreement, even putting aside the fact that UMB is not the trustee.  The complaint alleges that UMB sent BMS a pre-suit notice letter on October 21, 2024, Compl. ¶ 121, but it then filed its complaint only *twenty-four days later*, on November 14, 2024, *see* ECF No. 1.  No "Event of Default" for an alleged breach of section 7.8 of the CVR Agreement could have arisen in that time.  *See* CVR Agreement § 8.1(b) ("Event of Default" includes "material default in the performance . . . of any covenant or warranty. . . and continuance of such default or breach *for a period of ninety (90) days* after there has been given . . . a written notice specifying such default . . . and requiring it to be remedied") (emphasis added).

UMB attempts to salvage its failure to comply with section 8.1(b) by alleging that the October 21 letter provided a "Notice of Continuing Default" that related back to an earlier notice letter UMB sent to BMS on March 4, 2021, before UMB filed its previous lawsuit.  Compl. ¶ 120.  But UMB was not "the Trustee" when it sent that earlier letter, as the Court already held, *Dismissal Op.* at *1, and only "the Trustee" can send a "Notice of Default" under section 8.1(b).[19]

---

"Event of Default" can arise from an alleged breach of the covenant to use Diligent Efforts if, as here, a notice letter is not sent until after the CVR Agreement has terminated.  In those circumstances, an alleged breach cannot "continu[e]" because there is no continuing obligation under the contract, and there is no way to "remed[y]" an alleged breach during the grace period because there is no continuing obligation that can be performed correctly.  *See* CVR Agreement § 8.1(b).  Voluntary payment of breach-of-contract damages during the notice period is not a "remed[y] contemplated in section 8.1(b), and that concept disregards the contractual distinction between an "Event of Default" arising from failure to make payment, which is immediately actionable, and an "Event of Default" arising from a breach of a non-payment covenant, which is not actionable until the issuer has been provided a chance to "remedy" it during the 90-day grace period.  CVR Agreement § 8.1; *see Commentaries* § 5.1; *see also Bonderman*, 31 N.Y.3d at 40 & n.14 (describing distinction between payment and non-payment defaults).

[19] A "Notice of Default" also can be sent by "Majority Holders," CVR Agreement § 8.1(b), but the March 2021 letter was sent by UMB, allegedly as the trustee.  Compl. ¶ 120.

UMB's earlier letter therefore is a legal nullity under the CVR Agreement that could not give rise to an "Event of Default," as has been alleged in the complaint.

Because UMB did not wait to file suit until ninety days after it sent its pre-suit notice letter, the alleged breaches "specif[ied]" in its notice letter could not, and did not, ripen into an "Event of Default."  As courts applying New York law on this precise issue have recognized, "without an Event of Default, the Trustee has no power to bring any claim."  *U.S. Timberlands*, 2004 WL 1699057, at *3 (dismissing breach of contract action); *Neiman Marcus*, 128 N.Y.S.3d at 827 (dismissing fraudulent conveyance action).

In addition, because UMB is not the trustee, and was not the trustee, its letter to BMS dated October 21, 2024 cannot be a "Notice of Default," and it cannot lead to an "Event of Default" that would permit suit under any circumstances.

### B.    The Declaratory Judgment Claim Also Should Be Dismissed.

The Court also should dismiss UMB's declaratory judgment claim.  For the reasons already discussed, the complaint itself, and materials attached to the complaint, establish that Equiniti has not been removed as the trustee under the CVR Agreement and that UMB has not been appointed as its successor.  *See supra* at 10-16.

## **CONCLUSION**

For the foregoing reasons, BMS respectfully requests that the Court dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction, or under Rule 12(b)(6) for failure to state a claim, and grant BMS such other and further relief as the Court may deem proper.

Dated: New York, New York
　　　 January 14, 2025

DLA PIPER LLP (US)

By:  /s/ *John J. Clarke, Jr.*
　　　 John J. Clarke, Jr.
　　　 Jessica A. Masella

1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500

Attorneys for Defendant
 Bristol-Myers Squibb Company

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that he is counsel for defendant Bristol-Myers Squibb Co. in this action and that this memorandum of law complies with the word-count limitation in Local Civil Rule 7.1(c), as amended January 2, 2025.  The document includes 7,851 words, excluding the caption, table of contents, table of authorities, signature blocks, and any required certificates.

_____<i>/s/ John J. Clarke, Jr.</i>_____
John J. Clarke, Jr.
