UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

UMB BANK, N.A.,                    :

                Plaintiff,      :        ORAL ARGUMENT REQUESTED

                                  :

       v.                        :       Case No. 1:24-cv-8668 (JMF)

                                  :

BRISTOL-MYERS SQUIBB COMPANY   :
and EQUINITI TRUST COMPANY, LLC,  :

                                  :

              Defendants.    :

                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANT BRISTOL-MYERS SQUIBB COMPANY

John J. Clarke, Jr.
Jessica A. Masella
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
(212) 335-4500

Attorneys for Defendant
 Bristol-Myers Squibb Company

Dated:  March 6, 2025

Table of Contents

Page

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ........................................................................................................................3

    A.      The Parties ...............................................................................................3

    B.      The CVRs...................................................................................................3

    C.      The Liso-cel Application and UMB's Allegations ...................................4

    D.      Post-Termination Events............................................................................6

    E.      UMB's Previous Lawsuit...........................................................................7

    F.      The "Confirmation" and This Action ........................................................8

ARGUMENT .............................................................................................................................9

I.     THIS ACTION SHOULD BE DISMISSED FOR LACK OF
      SUBJECT MATTER JURISDICTION ...................................................................9

    A.      UMB Is Not the Trustee and Lacks Article III Standing .........................9

          1.      Only the Trustee Can Sue Under the CVR Agreement ...........................10

          2.      UMB Never Became the Trustee.................................................11

    B.      The Declaratory Judgment Claim in Count I
         Also Should Be Dismissed........................................................................16

II.    IN THE ALTERNATIVE, THE COMPLAINT SHOULD BE DISMISSED
      FOR FAILURE TO STATE A CLAIM ...................................................................16

    A.      BMS Cannot Be Liable for the Delisting and
         Deregistration of the CVRs......................................................................16

          1.      UMB Has Not Alleged an Actionable Breach.........................................17

          2.      The Implied Covenant of Good Faith and Fair Dealing
              Cannot Modify the Express Terms of the CVR Agreement .....................19

    B.      There Has Been No "Event of Default" That Would Permit
         a Trustee to Sue.......................................................................................20

          1.      UMB Did Not Send a "Notice of Default" for
              Counts III, IV, or V..................................................................................21

           2.      UMB's Post-Termination Notice Letter Cannot Give Rise to an
              "Event of Default" for Alleged Failure to Use "Diligent Efforts".............22

    C.      The Declaratory Judgment Claim in Count I Also Should Be Dismissed............25

CONCLUSION......................................................................................................................26

Table of Authorities

Page(s)

Cases

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................16

*Bailey v. Fish & Neave*,
    8 N.Y.3d 523 (2007) ..................................................................................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................16

*Blackrock Core Bond Portfolio v. U.S. Bank, N.A.*,
    165 F. Supp. 3d 80 (S.D.N.Y. 2016)....................................................11, 19

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
    866 F. Supp. 2d 257 (S.D.N.Y. 2012)..........................................................10

*Corresp. Servs. Corp. v. JVW Inv., Ltd.*,
    2004 WL 2181087 (S.D.N.Y. Sept. 29, 2004),
    *aff'd*, 442 F.3d 767 (2d Cir. 2006) ...............................................................9

*Cortlandt St. Recovery Corp. v. Bonderman*,
    31 N.Y.3d 30 (2018) ......................................................................... *passim*

*Cruden v. Bank of N.Y.*,
    957 F.2d 961 (2d Cir. 1992)........................................................................11

*Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*,
    838 F.2d 66 (2d Cir. 1988).........................................................................21

*Geller Biopharm, Inc. v. Amunix Pharms., Inc.*,
    2021 WL 415015 (S.D.N.Y. Sept. 13, 2021)................................................16

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (2002) ................................................................................14

*In re Taddeo*,
    685 F.2d 24 (2d Cir. 1982).........................................................................25

*Kaufman v. Eli Lilly & Co.*,
    65 N.Y.2d 449 (1985) ................................................................................11

*K. Bell & Assocs. v. Lloyd's Underwriters*,
    97 F.3d 632 (2d Cir. 1996).........................................................................10

Page(s)

*Kurz v. Holbrook*,
    989 A.2d 140 (Del. Ch. 2010),
    *aff'd in part, rev'd in part*, 992 A.2d 377 (Del. 2010)......................................................12, 17

*Law Debenture Tr. Co. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010)........................................................................................14, 19

*Len v. Fuller*,
    1997 WL 305833 (Del. Ch. May 30, 1997) .................................................................13

*Li v. Napolitano*,
    2009 WL 2358621 (S.D.N.Y. July 30, 2009) ...............................................................9

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................................9

*Murphy v. Am. Home Prods. Corp.*
    58 N.Y.2d 293 (1983) ....................................................................................................19

*Nat'l Cred. Union Admin. Bd. v. U.S. Bank, N.A.*,
    898 F.3d 243 (2d Cir. 2018)..........................................................................................11

*N.Y. Wheel Owner LLC v. Mammoet Hldg. B.V.*,
    481 F. Supp. 2d 216 (S.D.N.Y. 2020)..........................................................................24

*Olin Corp. v. Am. Home Assur. Co.*,
    704 F.3d 89 (2d Cir. 2012)............................................................................................10

*Pabst Brewing Co. v. Jacobs*,
    549 F. Supp. 1068 (D. Del.),
    *aff'd mem.*, 707 F.2d 1392 (3d Cir. 1982) .................................................................13

*Quadrant Structured Prods. Co. Ltd. v. Vertin*,
    23 N.Y.3d 549 (2014) ....................................................................................................10

*Semi-Tech Litig. LLC v. Bankers Tr. Co.*,
    353 F. Supp. 2d 460 (S.D.N.Y.),
    *aff'd on other grounds*, 450 F.3d 121 (2d Cir. 2005) .............................................21

*Sevel Argentina, S.A. v. Gen'l Motors Corp.*,
    46 F. Supp. 2d 261 (S.D.N.Y. 1999)............................................................................19

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998).........................................................................................................9

Page(s)

*Svensson v. Securian Life Ins. Co.*,
    706 F. Supp. 2d 521 (S.D.N.Y. 2010)............................................................................10

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...........................................................................................3

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).......................................................................................................9

*UBS Secs. LLC v. Highland Cap. Mgmt., L.P.*,
    2017 WL 1103879 (Sup. Ct. N.Y. Cnty. 2017) ...........................................................19

*UMB Bank, N.A. v. Bristol-Myers Squibb Co.*,
    2022 WL 2290609 (S.D.N.Y. June 24, 2022) ..........................................................23-25

*UMB Bank, N.A. v. Bristol-Myers Squibb Co.*,
    2024 WL 4355029 (S.D.N.Y. Sept. 30, 2024)........................................................ *passim*

*UMB Bank, N.A. v. Neiman Marcus Grp., Inc.*,
    128 N.Y.S.3d 823 (Sup. Ct. N.Y. Cnty. 2020) ..................................................... *passim*

*United States v. Bond*,
    762 F.3d 255 (2d Cir. 2014)...........................................................................................9

*U.S. Bank, N.A. v. U.S. Timberlands Klamath Falls, L.L.C.*,
    2004 WL 1699057 (Del. Ch. July 29, 2004)........................................................ *passim*

*U.S. Bank N.A. v. Windstream Servs. LLC*,
    2017 WL 5054726 (S.D.N.Y. Nov. 1, 2017) ...............................................................23

*Uribe v. Merchants Bank of N.Y.*,
    91 N.Y.2d 336 (1998) ...................................................................................................14

*Wallace v. 600 Partners Co.*,
    86 N.Y.2d 543 (1995) ...................................................................................................10

## Statutes and Rules

28 U.S.C. § 2201(a) ...........................................................................................................16

17 C.F.R. § 240.12d2-2(a) ...............................................................................................6-7

Fed. R. Civ. P. 12(b)(1)................................................................................................1, 3, 9

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 2, 16

Page(s)

Other Authorities

Am. Bar. Found., *Commentaries on Model Debenture Indenture*
  *Provisions* (1971) ............................................................................................ *passim*

## PRELIMINARY STATEMENT

Plaintiff UMB Bank, N.A. ("UMB") filed this action "solely in its capacity as Trustee" under the Contingent Value Rights Agreement dated as of November 20, 2019 ("CVR Agreement"), which governed a series of publicly traded contingent value rights ("CVRs") issued in connection with the merger between defendant Bristol-Myers Squibb Company ("BMS") and Celgene Corporation.  *See* Compl., Exh. A.  UMB's latest pleading adds several new causes of action, but its central claim is that BMS allegedly failed to use "Diligent Efforts" to obtain regulatory approval of liso-cel, a novel cancer therapy, in time to permit payment under the CVRs. The amended complaint should be dismissed pursuant to Rule 12(b)(1) or Rule 12(b)(6).

*First*, just as before, the Court lacks subject matter jurisdiction because UMB is not the trustee and therefore has no injury-in-fact. Fed. R. Civ. P. 12(b)(1).  The Court correctly dismissed UMB's original case for that reason.  *See UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, No. 1:21-cv-04897 (JMF), 2024 WL 4355029 (S.D.N.Y. Sept. 30, 2024) ("*Dismissal Op.*").  Under the plain language of the CVR Agreement, UMB's latest allegations cannot lead to a different conclusion. There still has been no "act of the Majority Holders" to remove Equiniti Trust Company ("Equiniti") as trustee and install UMB as its successor, and that defect is still fatal.

The amended complaint asserts that failures in UMB's attempt to replace Equiniti in December 2020 were cured by proxies collected ***in 2024*** from Cede & Co., as nominee for The Depository Trust Company ("DTC") – the registered Holder of exchange-traded CVRs.  Compl. ¶ 29.  But the CVR Agreement does not permit a defective consent solicitation to be corrected ***three years after the fact*** and long after the agreement itself ceased to be of any continuing "force or effect."  *See* CVR Agreement § 1.4(a) (no "vote or consent" shall be "valid or effective" for more than 120 days after record date), § 1.16 (termination).  The CVR Agreement also precludes

UMB's extra-contractual arguments, including its newest request for a declaratory judgment that the express requirements for changing the trustee should be ignored.  *See* Compl. ¶¶ 158-64.

*Second*, even if there were subject matter jurisdiction, the amended complaint should be dismissed for failure to state a claim.  Fed. R. Civ. P. 12(b)(6).  None of UMB's new claims based on the deregistration of the CVRs is actionable.  They depend on events allegedly occurring *after* the CVR Agreement terminated, when any conceivably relevant provision no longer had "force or effect," CVR Agreement § 1.16, and BMS cannot have "liability" under those provisions, *id.*

In addition, even if UMB were trustee, there has been no "Event of Default," and it therefore "has no power to bring any claim."  *See U.S. Bank, N.A. v. U.S. Timberlands Klamath Falls, L.L.C.*, 2004 WL 1699057, at *3 (Del. Ch. July 29, 2004); *UMB Bank, N.A. v. Neiman Marcus Grp., Inc.*, 128 N.Y.S.3d 823, 827 (Sup. Ct. N.Y. Cnty. 2020) (same).  There can be no "Event of Default" for UMB's three new claims because none was ever the subject of a pre-suit notice of default.  CVR Agreement § 8.1(b); *see* Compl. ¶ 129.  As for UMB's claim that BMS breached its covenant to use "Diligent Efforts," no one provided a notice of default before the CVR Agreement terminated, and no "Event of Default" can arise from a notice letter sent nearly four years after the CVR Agreement terminated.  CVR Agreement § 1.16.  Respectfully, the Court's previous interpretation to the contrary cannot be reconciled with the unambiguous provisions of the CVR Agreement.  The Court should reconsider that ruling.

That issue and others raised by this motion are now pending before the Second Circuit in appeals from the judgment this Court entered against UMB in its previous case.  Given those circumstances, the Court may wish to defer any ruling until the appeals have been decided.  But if the Court proceeds, UMB's latest complaint should be dismissed in its entirety.

## BACKGROUND[1]

### A.    The Parties

UMB is a national bank based in Missouri.  Compl. ¶ 51.  BMS is a global biopharmaceutical company incorporated in Delaware with its headquarters in New Jersey.  *Id.* ¶ 52.  Equiniti Trust Company, LLC, the successor to Equiniti, is a New York limited liability company beneficially owned by companies that are citizens of New York and Delaware.  *Id.* ¶ 53.

### B.    The CVRs

On January 3, 2019, BMS and Celgene announced they had entered into a merger agreement under which BMS would acquire Celgene for consideration consisting of $50 in cash, one share of BMS common stock, and one publicly traded CVR in exchange for each share of Celgene common stock.  *Id.* ¶ 62.  Contingent value rights are complex securities sometimes used in mergers to bridge valuation gaps relating to uncertain future events.  Here, the contingencies to payment were uncertain future approval decisions by the U.S. Food and Drug Administration ("FDA") for several Celgene product candidates.

In the Celgene transaction, each CVR represented a contingent right to payment of $9 in the future, but only if the FDA approved applications for three agreed-upon "milestone therapies" by their contractual milestone dates: (i) liso-cel, a chimeric antigen receptor therapy (CAR-T) for treatment of lymphoma; (ii) ozanimod, a drug for treatment of relapsing multiple sclerosis; and (iii) ide-cel, another CAR-T therapy, for treatment of multiple myeloma.  *Id.* ¶¶ 3, 57.  The milestone date for liso-cel and ozanimod was December 31, 2020; the milestone date for ide-cel

---

[1] Well-pleaded factual allegations are assumed to be true solely for the purpose of this motion to dismiss.  *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  "The Court may also 'consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff upon which it relied in bringing the suit.'"  *Id.* (citation omitted).  On a motion under Rule 12(b)(1), courts may consider additional materials.  *See infra* at 9 n.5.

was March 31, 2021.  *Id.* ¶ 58.  If the FDA failed to approve any one of the three in time, the CVR Agreement would terminate automatically and the CVRs would expire without value.  *Id.* ¶ 3; *Dismissal Op.* at *1.  The FDA was not bound by the CVR milestone deadlines.

The stockholders of BMS and Celgene approved the proposed merger at meetings held in April 2019, but the closing did not occur for seven more months.  Compl. ¶¶ 63, 64.  Upon the closing, on November 20, 2019, BMS entered into the CVR Agreement with Equiniti, as trustee.  *Id.* ¶ 64.  The CVRs then began trading on the New York Stock Exchange ("NYSE").

The FDA approved ozanimod and ide-cel before their milestone dates.  *Id.* ¶ 23.  The FDA also approved the biologics license application for liso-cel, but it did not issue that decision until February 5, 2021 – five weeks after the milestone date.  *Id.* ¶¶ 20, 105.  When the liso-cel milestone date passed without an FDA decision, the CVR Agreement terminated in accordance with its terms, and the CVRs expired without value at 12:01 a.m. on January 1, 2021.  *Id.* ¶¶ 17, 112; *see* CVR Agreement § 1.16.

### C.    The Liso-cel Application and UMB's Allegations

The complaint alleges that BMS breached section 7.8 of the CVR Agreement by allegedly failing to "use Diligent Efforts to achieve the Liso-cel Milestone."  Compl. ¶ 136.  Without addressing the significant impact on FDA operations that arose from the worst pandemic in a century, UMB contends that if BMS had used Diligent Efforts "it would have avoided much more than thirty-six days of delay" in obtaining the FDA approval decision for liso-cel.  *Id.* ¶ 20.

CAR-T therapies, such as liso-cel and ide-cel, are complex biological therapies that treat cancer using a patient's own genetically modified T-cells.  *Id.* ¶ 65.  By the beginning of 2019, when BMS and Celgene entered into the merger agreement, the FDA had approved only two CAR-T therapies.  *Id.* ¶ 66.  The FDA recognized the "complexities associated with manufacturing these products in a safe, reliable and cost-effective way," and for those reasons the agency was

developing guidance for sponsors of future applications. But even the first draft of that guidance was not issued until a year after the FDA approved liso-cel and ide-cel.[2]

On September 30, 2019, before the merger closing, Celgene filed the first component of the rolling application for approval of liso-cel with the FDA. *Id.* ¶ 72. On December 18, 2019, a few weeks after the closing, BMS submitted the final section, addressing Chemistry, Manufacturing, and Controls (CMC). *Id.* In direct conflict with UMB's allegation that the filing did not include "critical and mandatory information," *id.* ¶ 7, the FDA accepted the application and designated it for "Priority Review," meaning the agency had only six months, instead of ten, to reach a final decision under the Prescription Drug User Fee Act of 1995, as amended ("PDUFA"). *Id.* ¶ 76.

Soon after the FDA accepted the liso-cel application, the COVID-19 pandemic became a national emergency. The FDA announced a significant reduction of operations in response, including a dramatic reduction in the number of facility inspections that could be conducted by FDA staff. *Id.* ¶ 88.[3]

On March 23, 2020, not long after that announcement, the FDA issued an information request to BMS seeking supporting "data on assays and validation" relating to the CMC module of the liso-cel application. *Id.* ¶ 79. Weeks after BMS provided the requested information, the complaint alleges, the FDA concluded the data was so substantial that it constituted a "major amendment" to the application, which "automatically triggered a three-month extension of the PDUFA date" for liso-cel from August 17, 2020 to November 16, 2020. *Id.* That was still "weeks

---

[2] *See* FDA Statement dated Jan. 15, 2019, "*Statement on new policies to advance development of safe and effective cell and gene therapies*"; FDA Draft Guidance, "*Considerations for the Development of [CAR-T] Products,*" 87 Fed. Reg. 14893 (Mar. 16, 2022).

[3] *See* FDA Statement dated Mar. 18, 2020, "*Coronavirus (COVID-19) Update: FDA Focuses on Safety of Regulated Products While Scaling Back Domestic Inspections.*"

*before* the December 31, 2020" milestone date.  *Id.* (emphasis added).  The extended PDUFA date also was still a month *earlier* than if the liso-cel application had been on a regular review timeline. *See id.* ¶ 76.  BMS promptly disclosed this development.  *Id.* ¶ 82.

UMB alleges that BMS also "failed to take the steps necessary to prepare two [l]iso-cel manufacturing facilities for the FDA's inspections."  *Id.* ¶ 9.  The complaint acknowledges the pandemic caused the FDA to postpone the required inspections of two liso-cel manufacturing facilities until "later in 2020," *id.* ¶ 89, and a facility operated by Lonza AG was not inspected until December 3-10, 2020 – weeks *after* the extended PDUFA date, *id.* ¶¶ 11, 95.  Nevertheless, the agency ultimately completed both inspections, and BMS addressed FDA comments arising from them, *before* the liso-cel milestone date.  *Id.* ¶¶ 10, 11, 91, 93, 95, 98.  As already mentioned, the FDA approved liso-cel on February 5, 2021, five weeks after its milestone date.  *Id.* ¶¶ 20, 105.

### D.    Post-Termination Events

On January 1, 2021, BMS disclosed that because the FDA had not issued a decision on the liso-cel application by the end of the previous day, the CVR Agreement had terminated in accordance with its terms and the CVRs were "no longer eligible for payment[.]"  *Id.* ¶ 17.  The press release added that "The CVRs will no longer trade on the NYSE."  *Id.*, Exh. B.

The next business day, on January 4, 2021, the NYSE filed Form 25 with the Securities and Exchange Commission, which it amended on January 7, 2021, providing notice that the CVRs were being removed from listing and registration under section 12(b) of the Securities Exchange Act of 1934.[4]  As amended, the NYSE's filing stated that the CVRs would be delisted and deregistered because "[a]ll rights pertaining to the entire class of the security have been

---

[4] The amended complaint mistakenly suggests that BMS filed the Form 25.  Compl. ¶¶ 113-14.  The relevant national securities exchange, not the issuer, is required to make the filing. 17 C.F.R. § 240.12d2-2(a).

extinguished[.]"  17 C.F.R. § 240.12d2-2(a)(4); *see* Declaration of John J. Clarke, Jr. dated March 6, 2025 ("Clarke Decl."), Exhs. 1 & 2.

In a letter dated January 11, 2021, after the NYSE had filed the Form 25, BMS instructed the DTC to delete its entire position in the CVRs because they were "null, void and worthless." Compl. ¶ 116; *id.*, Exh. M.  UMB protested in a letter to the DTC – not because UMB had any concern about voting rights, as the complaint implies, but because UMB's financial backers wanted to continue trading in CVRs as they planned for litigation against BMS, even though the CVRs were no longer registered securities.  *See* Compl. Exh.  O, Exh. P.  The DTC declined to reinstate the CVRs.  *Id.* Exh. Q.

### E.    UMB's Previous Lawsuit

In November 2020, amidst news of COVID-19 delays in the liso-cel inspections, CVR investors recruited UMB to take over as trustee because it was perceived "to be better suited to bring litigation[.]" *Dismissal Op.* at *3; *see* Compl. ¶ 13.  On December 18, 2020, UMB delivered a document to BMS and Equiniti labelled an "Instrument of Removal, Appointment and Acceptance," which purported to reflect an "act of the Majority Holders" under the CVR Agreement to remove Equiniti, and appoint UMB, as the trustee.  *Id.*; *see* Compl. Exh. D.

On June 3, 2021, UMB filed a complaint against BMS, "solely in its capacity as Trustee," in which it asserted that BMS breached the CVR Agreement by allegedly failing to use "Diligent Efforts" to obtain FDA approval of liso-cel by its milestone date.  *Id.* ¶¶ 38, 128; *see Dismissal Op.* at *4.  In discovery, BMS confirmed that UMB had not obtained DTC's written authorization for the "Instrument," as required by the CVR Agreement.  *See* CVR Agreement §§ 1.4(a) & 4.10. BMS filed a motion to dismiss for lack of subject matter jurisdiction on that ground, which the Court granted in an opinion issued on September 30, 2024.  *Dismissal Op.* at *4, 13-14.

UMB appealed to the Second Circuit, and BMS cross-appealed to the extent the Court's earlier interlocutory opinion denying BMS's motion to dismiss for failure to state a claim was merged into the judgment. Both appeals are pending. *UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, Nos. 24-2865, 24-2928 (2d. Cir.).

###    F.    The "Confirmation" and This Action

UMB alleges that in early 2024 "CVR holders obtained proxies from Cede & Co., the DTC's nominee and the registered Holder for those holders' CVRs, which confirm UMB's replacement of Equiniti as Trustee in December 2020." Compl. ¶ 27. The complaint labels these documents the "Confirmation" and asserts that they retroactively installed UMB as the trustee by correcting the defects that led to dismissal of UMB's previous case. *Id.* ¶¶ 28-29.

UMB asserts a claim for a declaratory judgment that UMB, not Equiniti, is the trustee; claims against BMS for breach of section 7.8 (Diligent Efforts) and section 3.5(a) (Security Register) of the CVR Agreement and for breach of the covenant of good faith and fair dealing based on the delisting of the CVRs; and a claim for a declaratory judgment that the consent of registered Holders should not be required for an "act of the Majority Holders" despite express provisions in the CVR Agreement imposing that requirement.

**ARGUMENT**

I.    **THE ACTION SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION**

    A.    **UMB Is Not the Trustee and Lacks Article III Standing.**

This action should be dismissed for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "Subject matter jurisdiction is a 'threshold question that must be resolved . . . before proceeding to the merits.'"  *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (citations omitted).  If a federal court lacks jurisdiction, "the only function remaining to the court is that of announcing the fact and dismissing the cause."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citations omitted).[5]

UMB has conceded it suffered no personal injury.  *Dismissal Op.* at *5.  As with its earlier case, UMB filed this action "solely in its capacity" as the trustee under the CVR Agreement.  Compl. at 1; *id.* ¶ 32.  But UMB is not the trustee, and this action should be dismissed because, once again, UMB had "no justiciable claim against BMS when it filed suit."  *Dismissal Op.* at *11; *see TransUnion*, 594 U.S. at 423 ("For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (standing requires "injury in fact" and other elements).

---

    [5] It is the plaintiff's burden to establish federal subject matter jurisdiction.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021); *Dismissal Op.* at *5.  "On a motion to dismiss for lack of subject matter jurisdiction, the court must accept the material factual allegations contained in the complaint."  *Correspondent Servs. Corp. v. JVW Inv., Ltd.*, 2004 WL 2181087, at *6 (S.D.N.Y. Sept. 29, 2004), *aff'd*, 442 F.3d 767 (2d Cir. 2006) (*per curiam*).  But "where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings . . . to determine whether jurisdiction exists."  *Li v. Napolitano*, 2009 WL 2358621, at *1 (S.D.N.Y. July 30, 2009).  On this Rule 12(b)(1) motion, the Court may consider not only exhibits attached to the amended complaint but also facts established in the prior action, as recounted in the prior dismissal opinion, including exhibits to the Clarke Declaration.

### 1.    Only the Trustee Can Sue Under the CVR Agreement.

The CVR Agreement is an indenture subject to the provisions of the Trust Indenture Act. "An indenture is essentially a written agreement that bestows legal title of the securities in a single [t]rustee to protect the interests of individual investors who may be numerous or unknown to each other." *Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 39 (2018) (quoting *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 23 N.Y.3d 549, 555 (2014)). As a "stakeholder," the duties and obligations of an indenture trustee "'are exclusively defined by the terms of the indenture.'" *Neiman Marcus*, 128 N.Y.S.3d at 826 (quoting *Bonderman*, 31 N.Y.3d at 39).[6]

As UMB previously conceded, "'only a properly appointed Trustee would have standing to bring' this lawsuit." *Dismissal Op.* at *5 (quoting transcript). That is clear from the plain language of the CVR Agreement. *See* CVR Agreement § 8.1 (if there is an Event of Default, "*the Trustee* . . . shall bring suit . . ."); § 8.4 (if Event of Default has occurred "*the Trustee* may . . . enforce its rights and the rights of the Holders . . . by such appropriate judicial proceedings") (emphasis added). With limited exceptions not applicable here, Holders are barred from suing. *Id.* § 8.6.[7]

These contractual limitations – common in indentures governed by New York law – "make[] it more difficult for individual [security holders] to bring suits" when the majority might

---

[6] The CVR Agreement is governed by New York law. CVR Agreement, § 1.10. "[T]he initial interpretation of a contract 'is a matter of law for the court to decide[.]'" *Svensson v. Securian Life Ins. Co.*, 706 F. Supp. 2d 521, 525 (S.D.N.Y. 2010) (quoting *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)). The goal in that analysis is "to give effect to the intention of the parties as expressed in the unequivocal language employed." *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 269 (S.D.N.Y. 2012) (quoting *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548 (1995)); *see Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (contract is unambiguous where it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself").

[7] There must be an "Event of Default" before "the Trustee" can sue BMS, CVR Agreement §§ 8.1, 8.4, and there is no "Event of Default" here even if UMB were trustee. *See infra* at 20-25.

be opposed and "ensure that the proceeds of any litigation actually prosecuted will be shared ratably by all [holders]." *Bonderman*, 31 N.Y.3d at 43-44 (quoting *Quadrant Structured Prods.*, 23 N.Y.3d at 566); *see* Am. Bar. Found.*, Commentaries on Model Debenture Indenture Provisions* (1971) ("Commentaries"), §§ 5-3, 5-7.

The limitations apply not only to breach of contract claims but also to suits to enforce "any other legal or equitable right vested in the Trustee by this CVR Agreement or by Law," which include UMB's newly minted claims for declaratory judgment and for alleged breach of the implied covenant of good faith and fair dealing.   CVR Agreement § 8.4; *Neiman Marcus*, 128 N.Y.S.3d at 827 (indenture expressly limits "[t]he remedies that are 'available to' and powers that are 'conferred on' the [t]rustee"); *see U.S. Timberlands*, 2004 WL 1699057, at *2-4 (dismissing declaratory judgment, fraud, and breach of fiduciary duty claims).

### 2.    UMB Never Became the Trustee.

The unambiguous provisions of the CVR Agreement also control whether UMB replaced Equiniti as trustee.   *Dismissal Op.* at *6; *Bonderman*, 31 N.Y.3d at 39; *see Nat'l Credit Union Admin. Bd. v. U.S. Bank, N.A.*, 898 F.3d 243, 255 (2d Cir. 2018) ("New York law requires that we give effect to the plain meaning of the Indenture Agreements' unambiguous terms"); *Blackrock Core Bond Portfolio v. U.S. Bank, N.A.*, 165 F. Supp. 3d 80, 97 (S.D.N.Y. 2016) ("a trust indenture is a contract, and the court must interpret a written contract 'so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed'") (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)).

The Court's dismissal opinion and the ensuing judgment conclusively establish that UMB did not replace Equiniti as trustee by an "act of the Majority Holders" in December 2020. *Dismissal Op.* at *6; *see Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455 (1985) (discussing elements of collateral estoppel under New York law).   As the Court correctly held, the "Instrument

of Removal, Appointment and Acceptance" that UMB delivered on December 18, 2020, *see* Compl. ¶ 34; *id.*, Exh. D, was not "an act of the Majority Holders," as required to change the trustee, because it was supported only by signatures from beneficial owners that were not authorized by the registered Holder – DTC, through its nominee Cede & Co. *Dismissal Op.* at *2-6; *see* CVR Agreement §§ 1.4(a) (Acts of Holders), 4.10 (change in trustee).

Section 1.4 of the CVR Agreement governs "Acts of Holders" and provides that such acts "may be embodied in and evidenced by one or more instruments . . . signed by *such Holders* in person *or by an agent duly appointed in writing*," as of the "record date." CVR Agreement § 1.4(a) (emphasis added); *see Dismissal Op.* at *3. An instrument that has not been signed or authorized in writing by registered Holders (as of the record date) cannot be an "act of the Majority Holders" and cannot result in a change in trustees under sections 4.10(c) and (e) of the CVR Agreement.[8]

Just as its unambiguous provisions required dismissal of UMB's first lawsuit, the CVR Agreement also precludes UMB's current contention that "Cede & Co.'s purported *post hoc* approval effectively installed UMB as successor Trustee" *in 2024*. *Dismissal Op.* at *12. In dismissing UMB's previous case, the Court did not need to address that contention to hold that there was no subject matter jurisdiction. *Id.* But that is UMB's sole jurisdictional argument in this case, and it fails for several reasons.[9]

---

[8] Under the CVR Agreement, "Holder" means "a Person in whose name a Security is registered in the Security Register," and "Majority Holders" means "Holders of at least a majority of the Outstanding CVRs." *Dismissal Op.* at *3 (discussing CVR Agreement § 1.1). DTC, through Cede & Co., was the registered Holder of CVRs that traded on the NYSE. *Dismissal Op.* at *5; CVR Agreement § 3.5(b); *see generally Kurz v. Holbrook*, 989 A.2d 140, 147-48 (Del. Ch. 2010) (discussing DTC book-entry securities trading system), *aff'd in part, rev'd in part*, 992 A.2d 377 (Del. 2010).

[9] In contrast, for the Second Circuit to reverse the Court's dismissal ruling based on the Cede & Co. proxies, it *would* need to address the question and agree with UMB's mistaken argument. Otherwise, the appellate court could not hold that the belated proxies are sufficient to

*First*, under the CVR Agreement, the effectiveness of the beneficial owner signatures that were compiled in the "Instrument" lapsed by no later than ***April 17, 2021***, which was "one hundred twenty (120) days" after the "record date" of December 18, 2020 – when the Instrument was delivered to BMS.[10]  *See* CVR Agreement § 1.4(a) ("No such vote or consent shall be valid or effective for more than one hundred twenty (120) days after such record date.").  The expired beneficial owner signatures from December 2020 could not be retroactively validated by DTC proxies obtained ***more than three years later***.[11]

*Second*, and similarly, the CVR Agreement terminated automatically on January 1, 2021, when the liso-cel milestone date passed without an FDA approval decision.  *See* CVR Agreement § 1.16; Compl. ¶ 17.  Voting rights that previously accompanied the CVRs expired with the securities, meaning that even if the signatures of beneficial owners were not stale under section 1.4(a) (which they are), the DTC could not retroactively authorize any action urged by beneficial owners before the termination date.  *Cf. Len v. Fuller*, 1997 WL 305833, at *3 (Del. Ch. May 30, 1997) (seller of stock divests itself of equitable right "to compel a proxy from the registered owner or, more directly, to have its vote counted by the court in an election contest").

The plain language of the CVR Agreement does not offer any support for UMB's argument that the ability to change trustees – or to retroactively correct errors in a faulty consent solicitation

---

establish jurisdiction as of June 2021, when UMB filed its previous complaint.  *See Dismissal Op.* at *12 (explaining relationship of the two questions).

[10] The signatures in the "Instrument" purportedly were dated "as of" December 9, 2020.  Compl., Exh. D (copy of the "Instrument").  There was no attempt in 2020 to collect investor signatures "as of" December 18, 2020, Compl. ¶ 34; *see Dismissal Op.* at *3, but even if there had been those signatures would have become invalid for the same reason.

[11] Staleness of consents is a well-recognized securities law concept.  *See, e.g., Pabst Brewing Co. v. Jacobs*, 549 F. Supp. 1068, 1073 (D. Del.), *aff'd mem.*, 707 F.2d 1392 (3d Cir. 1982) (solicitation was misleading in stating consents would be valid for over seven months when Delaware law limited validity to 60 days).

effort – somehow survives termination.  *See* Compl. ¶ 28.  Section 1.16 provides that, upon

termination of the CVR Agreement, its provisions shall "be of no force or effect, and the Parties

hereto shall have no liability or obligations hereunder[.]"  CVR Agreement § 1.16.  That section

enumerates the provisions that survive termination, but section 4.10 – governing changes in the

trustee – is not one of them.  *Id.*  Section 1.16 "'must be enforced according to the plain meaning

of its terms.'"  *Dismissal Op.* at *6 (quoting *Bonderman*, 31 N.Y.3d at 39); *see Uribe v. Merchants*

*Bank of N.Y.*, 91 N.Y.2d 336, 340 (1998) (applying "canon of interpretive construction" that "the

inclusion of one is the exclusion of another").

The complaint asserts that the Court should disregard these dispositive provisions of the

governing contract on the ground that deregistration of the CVRs after the agreement terminated

allegedly "thwarted the ability of the CVR holders to satisfy any requirement . . . to obtain a proxy

from the Registered Holder[.]"  Compl. ¶ 30; *see id.* ¶ 164 (requesting declaratory judgment that

written authorization of registered Holder "is excused").  What UMB actually is requesting is to

rewrite the CVR Agreement because it dislikes the effects, but "a court is not free to alter the

contract to reflect its personal notions of fairness and equity."  *Greenfield v. Philles Recs., Inc.*, 98

N.Y.2d 562, 569-70 (2002); *see Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d

458, 468 (2d Cir. 2010) (collecting cases).[12]

Moreover, there is no factual basis for that relief.  As the Court previously recognized,

"UMB has no one to blame . . . but itself" for its failure to take the steps required for a valid "act

of the Majority Holders" to change the trustee.  *Dismissal Op.* at *13.  UMB could have chosen to

---

[12] UMB is not a beneficial owner of CVRs and does not have constitutional standing to
seek the declaratory judgment requested in Count V.  *See* Compl. ¶ 162.  Section 8.4 of the
CVR Agreement does not empower UMB to seek a ruling on behalf of beneficial owners, even if
it is the trustee.  CVR Agreement § 8.4 (trustee can sue to "protect and enforce the rights of *the*
*Holders*" following an "Event of Default") (emphasis added).

comply with the CVR Agreement when compliance mattered, but it chose *not* to obtain the DTC's proxy – even after UMB's proxy solicitor Okapi Partners LLC received questions about "whether the consent of *registered* holders was required" and even after the DTC itself asked whether "it would be receiving a consent solicitation notice." *Id.* at *3 (emphasis in original); *see* Clarke Decl., Exhs. 3, 4, 5. It was UMB – not BMS – that knew these facts, and it was UMB that apparently chose to sweep them under the rug in the hope that its failure to comply with the CVR Agreement would never come to light.

*Finally*, even if these points were not dispositive (and they are), UMB has not shown an "act" by a "majority of Holders" through beneficial owner signatures for whom the DTC retroactively provided its proxy. UMB alleges it has retroactive proxies from the DTC with respect to "392,525,875 CVRs . . . as of December 9, 2020," the "effective" date UMB used in the "Instrument." Compl. ¶ 43; *see id.*, Exh. D.[13] But that includes 41,478,639 CVRs owned by investors who did not sign the "Instrument" in December 2020 – which is the defective action UMB attempted to retroactively correct.[14] Without them, the total is less than a majority (even using UMB's denominator). Similarly, based on figures provided in the retroactive DTC proxies the "Instrument" overstated holdings of several CVR investors, resulting in a further overcounting

---

[13] There was no effort in 2020 to collect beneficial owner signatures for December 18, 2020, so there is no defect to even attempt to cure with belated proxies from Cede & Co. Even if there were, the same deficiencies exist for that date. *See* Compl. Exh. D.

[14] *See* Compl. Exh. G (CVRs beneficially owned by ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

of 27,589,516 CVRs – also enough, by itself, to reduce the total below a majority (and adding to the previous shortfall).[15]

### B.    The Declaratory Judgment Claim in Count I Also Should Be Dismissed.

The Court also should dismiss Count I for lack of subject matter jurisdiction, or decline to exercise jurisdiction over it, because that request for a declaratory judgment that UMB is the trustee adds nothing to the complaint even if UMB could claim the necessary injury to assert it. 28 U.S.C. § 2201.  Whether UMB is the trustee will need to be decided before any of its other claims can proceed.  *See Geller Biopharm, Inc. v. Amunix Pharms., Inc.*, 2021 WL 4155015, at *11 (S.D.N.Y. Sept. 13, 2021) (dismissing declaratory judgment claim as superfluous).

## II.    IN THE ALTERNATIVE, THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Even if subject matter jurisdiction could be established, the complaint should be dismissed for failure to state a claim.  Fed. R. Civ. P. 12(b)(6).[16]

### A.    BMS Cannot Be Liable for the Delisting and Deregistration of the CVRs.

In Count III of the amended complaint, UMB claims BMS breached section 3.5(a) of the CVR Agreement by failing to cause the "Security Register" to be kept.  Compl. ¶¶ 143-49.  In Count IV, UMB claims BMS breached an implied covenant of good faith by "delisting the CVRs from the NYSE and directing the DTC to delete" CVR positions from its system.  *Id.* ¶¶ 150-57.

---

[15]  These investors and the December 2020 overstatement are: ███████████
████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
██████████.

[16]  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A facially plausible claim is one that enables the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  If the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

In Count V, UMB seeks a declaratory judgment that the registered Holder requirement for "Acts of Holders" should be ignored based on similar allegations.  *Id.* ¶¶ 158-64.  None of these post-termination claims is actionable.

### 1.    UMB Has Not Alleged an Actionable Breach.

Section 3.5(a) of the CVR Agreement required BMS to "cause to be kept" the "Security Register" providing "for the registration of Securities and of transfers of Securities." CVR Agreement § 3.5(a).  UMB's assertion that BMS breached that provision when it "directed the DTC to delete" the CVRs from its system on January 11, 2021, Compl. ¶ 145, does not state a claim for several reasons.

*First*, BMS *did* cause a Security Register to be maintained by Equiniti, which UMB does not dispute is the "Security Registrar."  *See* CVR Agreement § 3.5(a).  The amended complaint concedes there is a Security Register, Compl. ¶¶ 3 n.1, 41, and a copy was submitted in support of BMS's motion to dismiss UMB's previous case, *see Dismissal Op.* at *5.

*Second*, the Security Register is different from DTC's recordkeeping for transactions in beneficial interests in the CVRs, which was governed by section 3.5(b)(ii) rather than section 3.5(a).  As the "Depositary" under the CVR Agreement, the DTC was responsible for maintaining records concerning "[t]he transfer and exchange of beneficial interests" in CVRs, CVR Agreement § 3.5(b)(ii), and "no written orders or instructions [were] required to be delivered to the Security Registrar to effect" such transfers.  *Id.*  The division of record-keeping between the Security Register for *registered* ownership and the DTC system for *beneficial* ownership was required because of the registration and listing of the CVRs for trading on a national securities exchange.  *See Kurz*, 989 A.2d at 167-69 (describing DTC system and reasons for it).

*Third*, section 3.5 ceased to exist after the CVR Agreement terminated on January 1, 2021, CVR Agreement § 1.16, which is why the Security Register "is the same as it was on

December 31st," Compl. ¶ 123. Under section 1.16, CVR Agreement provisions that were not specifically excluded from termination ceased to have any continuing "force or effect" upon termination and BMS cannot have "liability" under them. CVR Agreement § 1.16. *None* of the provisions in the CVR Agreement that governed the listing, registration, ownership, or transfer of CVRs – whether as registered Holder or beneficial owner – survived termination, nor did provisions governing the removal or replacement of the trustee. *See* CVR Agreement §§ 1.16, 1.4, 3.1, 3.2, 3.5, 3.8, 4.10, 7.2, 7.6.

Contrary to UMB's contentions, none of those provisions *needed* to survive to make effective the enforcement mechanisms in Article VIII, which did expressly survive termination. *See* Compl. ¶ 144; CVR Agreement § 1.16. If – unlike here – an Event of Default existed that empowered Equiniti (the trustee) to sue, then the conduct of such post-termination litigation could be overseen by "Majority Holders" as of the termination date, December 31, 2020 – the records for which are available in the DTC system. *See* CVR Agreement § 8.9(a). The same Holders also would receive any recovery.

Consistent with the contract, on January 1, 2021, BMS announced that the CVR Agreement "terminated automatically in accordance with its terms," that "the CVRs are no longer eligible for payment under the CVR Agreement," and that "[t]he CVRs will no longer trade on the NYSE." Compl., Exh. B. The next business day, January 4, 2021, the NYSE filed a "notification of the removal from listing and registration" of the CVRs. Clarke Decl., Exhs. 1 & 2. Only after those NYSE filings did BMS instruct the DTC to remove the CVRs from its system. Compl. ¶ 19; *see id.* Exh. C.

UMB protested all of these actions, but neither the NYSE nor the DTC changed their decisions. *See id.* ¶¶ 114, 117-20. By continuing to trade in CVRs, and by advocating for gray-market trading after the CVRs were delisted and deregistered, UMB and its backers have given

rise to uncertainty and risk for CVR investors, and UMB is now attempting (again) to blame BMS for the results of its own actions.  *See id.* ¶¶ 113-120 & Exhs. M, N, O, P & Q.

*Finally*, the Court cannot rewrite the termination provisions of the CVR Agreement to restore the listing or registration of the CVRs or to disregard the registered Holder requirement, as UMB requests in Counts III, IV, and V.  "[A] trust indenture is a contract" that must be interpreted "to give effect to the intention of the parties as expressed in [its] unequivocal language[.]" *Blackrock Core Bond Portfolio*, 165 F. Supp. 3d at 97; *see Bonderman*, 31 N.Y.3d at 39. "'[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Maverick Tube*, 595 F.3d at 468 (quoting *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007)).

### 2.    The Implied Covenant of Good Faith and Fair Dealing Cannot Modify the Express Terms of the CVR Agreement.

UMB's claim for breach of the implied covenant of good faith and fair dealing also should be dismissed.  Compl. ¶¶ 150-57.  None of the provisions concerning the listing and registration of CVRs, or removal and replacement of the trustee, survived termination of the CVR Agreement. *See* CVR Agreement § 1.16.  No duty can be implied under those terminated provisions.

New York law recognizes that an obligation of good faith may be implied "in furtherance of other terms of the agreement," but  no such obligation can be implied that "would be inconsistent with other terms of the contractual relationship[.]"  *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983).  There can be no implied covenant of good faith and fair dealing under a contract provision that no longer exists.  *See Sevel Argentina, S.A. v. Gen. Motors Corp.*, 46 F. Supp. 2d 261, 268 (S.D.N.Y. 1999) (dismissing good faith claim arising under expired contract); *UBS Secs. LLC v. Highland Cap. Mgmt., L.P.*, 2017 WL 1103879, at *17 (Sup. Ct. N.Y. Cnty. 2017) (same under terminated contract).

19

**B.    There Has Been No "Event of Default" That Would Permit a Trustee to Sue.**

The amended complaint also must be dismissed because there has not been an "Event of Default" that would empower UMB to sue.  An indenture trustee "is limited to those powers specifically articulated" in the indenture, *U.S. Timberlands*, 2004 WL 1699057, at *2, and one such limitation is that "[t]he power of the Trustee to sue the Issuer . . . is contingent on the occurrence of an Event of Default."  *Id.* at *3; *see Neiman Marcus*, 128 N.Y.S.3d at 826 (whether trustee can sue depends on "words actually used in the indenture[]") (citing *Bonderman*, 31 N.Y.3d at 44).

As with many indentures, the CVR Agreement provides that the trustee only can "bring suit" or initiate "judicial proceedings" – whether for breach of contract or "to protect and enforce" rights "at Law or in equity" – when there has been an "Event of Default."  CVR Agreement §§ 8.1, 8.4.  A suit filed by the trustee without an "Event of Default" must be dismissed, regardless of the claims asserted.  *See Neiman Marcus*, 128 N.Y.S. at 827-28 (dismissing claims for fraudulent conveyance and tortious interference); *U.S. Timberlands*, 2004 WL 1699057, at *3-5 (dismissing claims for declaratory judgment, breach of fiduciary duty, and fraud).

How a "breach" or a "default" can become an "Event of Default" depends on its nature.  A failure to make payment when payment is due (that is, when all of the milestones have been met) automatically turns into an "Event of Default."  CVR Agreement § 8.1(a).  But *non-payment* covenant defaults "are not automatic events of default" and only can "become events of default after formal written notice is given to the Company and the default continues for a grace period after such notice."  *Commentaries*, § 5-1(3) at 207; *see U.S. Timberlands*, 2004 WL 1699057, at *3 ("if there is no failure to make a required payment, the Indenture makes the Trustee's authority to

20

sue dependent upon the giving of notice of a default and passage of the 60-day cure period").[17] The "Diligent Efforts" and "Security Register" provisions under which UMB purports to sue are both examples of non-payment covenants. *See* CVR Agreement §§ 3.5(a), 7.8.

Consistent with longstanding usage, the CVR Agreement provides that a "default" or "breach" of a non-payment covenant will not become an "Event of Default" unless a "material default in the performance" by BMS "continu[es]" for a period of ninety days after it receives a written "Notice of Default" that "specif[ies]" the default and "requir[es] it to be remedied[.]" *Id.* § 8.1(b).

### 1.    UMB Did Not Send a "Notice of Default" for Counts III, IV, or V.

UMB alleges it sent BMS a notice of default on October 21, 2024. Compl. ¶ 129. The only breach allegedly addressed in that "notice" was an alleged breach of BMS's "obligations to use Diligent Efforts to achieve the Liso-cel Milestone." *Id.* ¶ 130. UMB does not allege that the notice letter included notice that BMS had breached its obligation under section 3.5 to cause the Security Register to be kept (Count III), that BMS breached the implied covenant of good faith and fair dealing (Count IV), or that "any condition precedent of the CVR Agreement that would require a beneficial holder to obtain a proxy from the Registered Holder to act under the CVR Agreement is excused" (Count V).[18] "Without notice, there is no Event of Default, and without an Event of Default, the Trustee has no power to bring any claim." *U.S. Timberlands*, 2004 WL

---

[17] Courts applying New York law have looked to the *Commentaries*. *See, e.g., Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 71-72 (2d Cir. 1988) (discussing notice of redemption); *Semi-Tech Litig. LLC v. Bankers Tr. Co.*, 353 F. Supp. 2d 460, 474-78 (S.D.N.Y. 2005) (discussing trustee duties), *aff'd on other grounds*, 450 F.3d 121 (2d Cir. 2005).

[18] UMB portrays the October 2024 letter as a "notice of continuing default," referring back to a letter it sent BMS in March 2021 when UMB was not trustee. Compl. ¶¶ 128-29; *see Dismissal Op.* at *6. Because a "Notice of Default" must be sent by "the Trustee," CVR Agreement § 8.1(b), UMB's March 2021 letter could not turn into an "Event of Default" under any circumstance.

1699057, at *3 (dismissing claims for declaratory judgment, breach of fiduciary duty, and fraud); *Neiman Marcus*, 128 N.Y.S.3d at 827 (dismissing claims asserted by UMB Bank as trustee for fraudulent conveyance and tortious interference).

### 2.    UMB's Post-Termination Notice Letter Cannot Give Rise to an "Event of Default" for Alleged Failure to Use "Diligent Efforts."

UMB's notice letter dated October 21, 2024 – nearly **four years** after the CVR Agreement terminated – cannot give rise to an "Event of Default" because the covenant to use "Diligent Efforts" had no "force or effect" at that time and BMS had no remaining "obligations" under it, nor was it possible for an alleged breach of the provision to "continu[e]" or to be "remedied" then. CVR Agreement §§ 1.16, 8.1(b).[19]

The 90-day grace period provided in section 8.1(b) is an important BMS contract right. It allows BMS an opportunity to avoid litigation by correcting an identified covenant default before the trustee has any right to bring suit. *Commentaries*, § 5-1 at 207; *see U.S. Timberlands*, 2004 WL 1699057, at *3. The termination provision in section 1.16 also provides BMS important contract rights. It protects BMS from hindsight breach of contract lawsuits, spurred by disappointed CVR investors, based on alleged breaches not identified in time for BMS to "remed[y]" them so that it could avoid wasteful and costly litigation. CVR Agreement § 8.1(b).

The notice provision places the burden on the trustee (and Holders) to monitor developments and bring concerns to the issuer's attention in time for them to be addressed. *Commentaries*, § 5-1 at 207. For example, UMB cites the FDA's "major amendment" determination in May 2020 as supposed evidence of BMS's failure to use "Diligent Efforts," and contends that the market price of CVRs "dropped to just $3.00 in the days following [BMS's]

_____

[19] Further, UMB is not the trustee and was not when it sent its October 21, 2024 letter, which could not be a "Notice of Default" giving rise to an "Event of Default" regardless of its timing. CVR Agreement § 8.1(b).

announcement" of that development.  Compl. ¶ 82.  But even though the trustee and CVR investors were well aware of that setback – and even though UMB now claims it is evidence of a failure to use "Diligent Efforts" – *no one* sent BMS a notice of default during the ***eight months*** between BMS's own announcement of that development and when the CVR Agreement terminated.  The CVR Agreement cannot be read to allocate the risk of that delay to BMS.

BMS acknowledges the Court's previous interlocutory ruling that termination of the CVR Agreement does not prevent a post-termination notice of default from maturing into an "Event of Default."  *See UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, 2022 WL 2290609 (S.D.N.Y. June 24, 2022).  Respectfully, that interpretation cannot be reconciled with the plain language of the CVR Agreement, and the Court should reconsider it here.

*First*, the Court's interpretation does not account for the distinction between an "Event of Default," on one hand, and a "breach" or "default," on the other hand.  Only an "Event of Default" can give rise to "liability," because BMS cannot be sued for breach unless there has been one.  *See Neiman Marcus*, 128 N.Y.S.3d at 826 (trustee's standing to assert "a post-event-of-default claim" derived "strictly from the indenture") (discussing *Bonderman*, 31 N.Y.3d at 44); *U.S. Timberlands*, 2004 WL 1699057, at *3.  This Court has recognized the same distinction.  *See U.S. Bank N.A. v. Windstream Servs. LLC*, 2017 WL 5054726 (S.D.N.Y. Nov. 1, 2017) (Furman, J.) (tolling "60-day cure period" under indenture to defer occurrence of "Event of Default" and permit discovery concerning alleged default).

Even though, as the Court observed, section 1.16 provides that "termination of the CVR Agreement shall not relieve any Party of *liability* arising from any material breach of its obligations . . . prior to the Termination Date," CVR Agreement § 1.16 (emphasis added), BMS cannot have "liability" for an alleged failure to use "Diligent Efforts" *unless* the trustee first provides written notice "specifying such default or breach and requiring it to be remedied," *and*

the specified default nevertheless "continu[es]" for the next 90 days.  CVR Agreement § 8.1(b).

When a notice letter is not sent until after the CVR Agreement has terminated, an alleged failure

to use "Diligent Efforts" cannot "continu[e]" for ninety days after notice, *id.*, because under the

CVR Agreement the covenant no longer has any "force or effect" and BMS has no "liability *or*

*obligations*" under it, *id.* § 1.16 (emphasis added).  The savings provision in section 1.16 cannot

be read to *impose* liability when these other provisions eliminate it.

      The survival of "Article 8, which empowers [the trustee] to bring suit," does not alter this

conclusion.  *UMB Bank*, 2022 WL 2290609, at *2; *see* CVR Agreement § 1.16.  The survival of

those enforcement provisions does not change their terms.  Even after termination, the trustee only

can sue if an "Event of Default" "occurs and is continuing" (and has not been waived).

CVR Agreement §§ 8.1, 8.4.  The requirements for there to be an "Event of Default" remain the

same, and they cannot be satisfied for an alleged breach of a non-payment covenant when a notice

letter is sent after termination.

      *Second*, the distinction between a "default" and an "Event of Default" was not at issue in

*N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216 (S.D.N.Y. 2020), which

the Court cited for the proposition that "[o]rdinarily, termination of an agreement" does not excuse

the terminated party from liability for a breach arising before termination.  *UMB Bank*, 2002 WL

2290609, at *2.  When, as here, the agreement is an indenture in which a trustee cannot sue unless

there has been an "Event of Default," that distinction matters.

      *Third*, respectfully, the Court misread the CVR Agreement in reasoning that it "does not

require that the breach be amenable to cure in the ninety-day notice period[.]"  *Id.*  In fact, it does.

Section 8.1(b) provides that before there can be an "Event of Default," there must be "material

default *in the performance*" of a covenant for which the trustee provides BMS "a written notice

*specifying* such default or breach *and requiring it to be remedied*" followed by the "continuance"

of the default for ninety more days.  CVR Agreement § 8.1(b) (emphasis added).  This unequivocal language unquestionably requires that BMS be given the chance to remedy its alleged breach before it can turn into an "Event of Default."  That is consistent with the settled understanding of such provisions under New York law.  *See U.S. Timberlands*, 2004 WL 1699057, at *3; *Commentaries*, § 5-1 at 207.  Nor does the use of the word "remedied" instead of "cured" make a difference.  Section 8.1 uses the words interchangeably.  *See* CVR Agreement § 8.1 ("if any and all Events of Default under this CVR Agreement shall have been ***cured***, waived or ***otherwise remedied*** as provided herein . . .") (emphasis added).

*Finally*, the suggestion that "payment of damages" would be an "alternative way[] to remedy a default" fails to consider the distinction between payment defaults and breaches of non-payment covenants.  *See UMB Bank*, 2022 WL 2290609, at *2.  The CVR Agreement permits the trustee to sue BMS immediately for a failure to make payment on the CVRs when payment is due.  CVR Agreement § 8.1(a).  But for a breach of a non-payment covenant, the trustee does not have that power unless BMS fails to correct a noticed default during the ensuing 90-day period.  *Id.* § 8.1(b); *Commentaries*, § 5-1 at 207 (discussing purpose of "grace period"); *see Bonderman*, 31 N.Y.3d at 40 & n.14 (describing distinction between payment and non-payment defaults).  As the Second Circuit has recognized, "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions."  *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982).  Payment of full contract damages is something quite different than that.

### C.    The Declaratory Judgment Claim in Count I Also Should Be Dismissed.

The Court also should dismiss UMB's declaratory judgment claim because the complaint and its incorporated exhibits establish that UMB is not the trustee.  *See supra* at 9-16.

## <u>CONCLUSION</u>

BMS respectfully requests that the Court dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction, or under Rule 12(b)(6) for failure to state a claim.

Dated: New York, New York                         DLA PIPER LLP (US)
       March 6, 2025


                                   By:    /s/ John J. Clarke, Jr.       
                                        John J. Clarke, Jr.
                                        Jessica A. Masella

                                   1251 Avenue of the Americas
                                   New York, New York 10020-1104
                                   (212) 335-4500

                                   Attorneys for Defendant
                                    Bristol-Myers Squibb Company

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that he is counsel for defendant Bristol-Myers Squibb Co. in this action and that this memorandum of law complies with the word-count limitation in Local Civil Rule 7.1(c), as amended January 2, 2025. The document includes 8,658 words, excluding the caption, table of contents, table of authorities, signature blocks, and any required certificates.

<u>        /s/ John J. Clarke, Jr.             </u>
John J. Clarke, Jr.