UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                      :

UMB BANK, N.A.,                              :

                      :

                 Plaintiff,              :

                      :                     24-CV-8668 (JMF)

             -v-                      :

                      :              <u>OPINION AND ORDER</u>

BRISTOL-MYERS SQUIBB COMPANY et al.,      :

                      :

                 Defendants.         :

                      :

-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        This case is the latest chapter in a $6.7 billion contract dispute arising out of the

November 2019 acquisition by Bristol-Myers Squibb Company ("BMS") of Celgene

Corporation ("Celgene"). *See* ECF No. 45 ("Compl."), ¶¶ 1-2.  In connection with the

acquisition, BMS issued to Celgene shareholders contingent value rights, also known as CVRs,

which would have value only if the Food and Drug Administration ("FDA") approved marketing

applications for three of Celgene's most valuable drug products by specified milestone dates.  *Id.*

¶¶ 2-3.  If FDA approval of any of these drugs came even one day late, the agreement governing

the CVRs (the "CVR Agreement") would automatically terminate and the CVRs would be

rendered worthless.  *Id.* ¶¶ 3, 16-17; *see* ECF No. 1-1 ("CVR Agrmt.").  Plaintiff UMB Bank,

N.A. ("UMB"), purportedly as Trustee for the CVR holders, alleges that BMS, in order to avoid

paying CVR holders the $6.7 billion they otherwise would have been due, slow rolled the

approval process for one drug, causing it to be approved thirty-six days after the relevant

milestone.  Compl. ¶¶ 1, 20.  It alleges that BMS breached the CVR Agreement by failing to use

"Diligent Efforts" to get the therapy approved on time, *id.* ¶¶ 134-42, and by failing to maintain

its electronic trading system for CVRs after the CVR Agreement was terminated, *id.* ¶¶ 143-64.

UMB first filed suit against BMS on June 3, 2021, *see* No. 21-CV-4897 (JMF) (S.D.N.Y.), ECF No. 1, but — after extensive discovery — the Court ended up dismissing the case for lack of subject-matter jurisdiction, *see UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, No. 21-CV-4897 (JMF), 2024 WL 4355029, at *14 (S.D.N.Y. Sept. 30, 2024) ("*UMB I*").  It did so because, under the terms of the CVR Agreement, only the Trustee for the CVR holders may sue to enforce the Agreement.  *Id.* at *2.  Equiniti Trust Company ("Equiniti') was the original Trustee named in the CVR Agreement, not UMB.  UMB alleged that it had replaced Equiniti as Trustee a few months before filing suit through a vote of the CVR holders.  *Id.* at *4.  But the Court concluded that UMB had never been properly appointed as Trustee before it filed the lawsuit because, while the CVR Agreement provides that the Trustee can be removed and a successor Trustee appointed by a majority of *registered* CVR holders, the appointment of UMB and the removal of Equiniti were supported by only a majority of the *beneficial* owners of the CVRs.  *Id.* at *6-8.  The Court accordingly dismissed the suit for lack of standing.[1]

Significantly, that dismissal was without prejudice to the refiling of a new lawsuit by a properly appointed Trustee.  *Id.* at *14.  The Court explained that "the question of who the Trustee is now — namely, whether it is still Equiniti or, as a result of [a] 'reconfirmation' process" that had been conducted after the lawsuit was filed, "whether it is now UMB," was "a question for another day."  *Id.*  It noted that if a new lawsuit were filed, and that lawsuit "were to survive jurisdictional challenge, the Court would likely pick up where [the first case] left off."  *Id.* at *14 n.5.  Sure enough, shortly after dismissal of the initial suit, UMB filed this action.  *See* ECF No. 1.  UMB maintains that it *now* has standing to bring the action because of the

---

[1]    The Court's ruling is the subject of a pending appeal.  *See UMB Bank, N.A. v. Bristol Myers Squibb Co.*, No. 24-2928 (2d Cir. appeal docketed Nov. 8, 2024).

"reconfirmation" process that was conducted in 2024. Specifically, UMB alleges that the CVR holders have obtained proxies from Cede & Co. (the Registered Holder and Nominee for the Depository Trust Company ("DTC")) for UMB's appointment as Trustee as of both December 9 and 18, 2020, thus replacing Equiniti with UMB as Trustee. Compl. ¶ 41.

BMS now moves, pursuant to Rules 12(b)(1) and 12(b)(6), to dismiss the case for lack of subject-matter jurisdiction and for failure to state a claim. *See* ECF No. 51; *see also* ECF No. 52 ("Def.'s Mem."), at 9. BMS argues, among other things, that UMB still lacks standing to sue because the reconfirmation process could not validly install UMB as the successor Trustee. *See* Def.'s Mem. 9-16. For the reasons that follow, the motion is GRANTED in part and DENIED in part. In short, BMS's motion to dismiss for lack of subject-matter jurisdiction is denied, but its motion to dismiss Counts III and V of the Complaint for failure to state a claim is granted. All other claims survive the motion to dismiss.

## BACKGROUND

The Court assumes the parties' familiarity with the underlying facts and procedural history, which the Court summarizes only as necessary to explain its decisions on the instant motion. The summary is drawn from the Complaint, the materials submitted by the parties in connection with the instant motion, and the Court's previous Orders in this case. *See Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

As noted, this dispute stems from BMS's November 2019 acquisition of Celgene, a competitor in the pharmaceutical industry. Compl. ¶¶ 54-64. In September 2018, BMS proposed a merger that would result in Celgene becoming its wholly owned subsidiary. *Id.* ¶ 54. In an effort to bridge a gap between the parties with respect to Celgene's valuation, BMS proposed issuing contingent value rights — or CVRs — to Celgene shareholders as additional

consideration for their shares. *Id.* ¶¶ 54-55. At bottom, a CVR is a security that generally requires the issuer to make a payment to the holder of the security if a specified event occurs by a specified date. *Id.* ¶ 55. Following months of intense negotiations, BMS and Celgene agreed to a set of terms, which were ultimately memorialized in a merger agreement and accompanying CVR Agreement between BMS and Equiniti, as Trustee for the CVR holders — that became effective on November 20, 2019. *Id.* ¶¶ 53, 56, 62-64.

In brief, the deal involved the issuance of CVRs by BMS, each of which would entitle its holder to a one-time $9 payment if certain "milestones" were met — specifically, approval by the FDA of three Celgene drug products (Liso-cel, Ozanimod, and Ide-cel) by specific dates. *Id.* ¶¶ 57-58. If any milestone was missed, however, the CVRs would expire worthless, and BMS would owe the CVR holders nothing. *Id*. ¶ 58. Under the terms of the CVR Agreement, BMS was required to "use Diligent Efforts to achieve the Milestone[s]" — with "Diligent Efforts" defined, in turn, as the "efforts of a Person to carry out its obligations in a diligent manner using such effort and employing such resources normally used by such Person in the exercise of its reasonable business discretion relating to the research, development or commercialization of a product, that is of similar market potential at a similar stage in its development or product life." *Id.* ¶ 60 (quoting CVR Agrmt. §§ 7.8, 1.1).

## A.  The CVR Agreement

Several provisions of the CVR Agreement are relevant here. First, as noted above, the Agreement provides that only the Trustee is authorized to bring suit in the event of a default. Specifically, Section 8.1 provides that, in the event of a default, "either the Trustee by notice in writing to the Company or the Trustee upon the written request of the Majority Holders by notice in writing to the Company (and to the Trustee if given by the Majority Holders), shall bring suit

to protect the rights of the Holders." CVR Agrmt. § 8.1. Similarly, Section 8.4 states that, "[i]n case an Event of Default has occurred, has not been waived and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders under this CVR Agreement by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights . . . ." *Id.* § 8.4.

Second, the Agreement includes provisions regarding the resignation or removal of the Trustee and appointment of a successor Trustee. As relevant here, Section 4.10(b) provides that "[t]he Trustee . . . may resign at any time by giving written notice thereof to the Company." *Id.* § 4.10(b). Section 4.10(c) provides that "[t]he Trustee may be removed at any time by an act of the Majority Holders, delivered to the Trustee and to the Company." *Id.* § 4.10(c). And Section 4.10(e) provides, in relevant part, that

> [i]f the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause, the Company, by a Board Resolution or an action of the chief executive officer of the Company, shall promptly appoint a successor Trustee. If, within one year after any resignation, removal or incapacity, or the occurrence of such vacancy, a successor Trustee shall be appointed by act of the Majority Holders delivered to the Company and the retiring Trustee, then the successor Trustee so appointed shall . . . become the successor Trustee and supersede the successor Trustee appointed by the Company.

*Id.* § 4.10(e). Finally, Section 4.10(f) provides that "[t]he Company shall give notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event . . . to the Holders of Securities as their names and addresses appear in the Security Register." *Id.* § 4.10(f).

Significantly, "Holders" and "Majority Holders" are defined terms. The CVR Agreement defines "Holder" as "a Person in whose name a Security is registered in the Security Register." *Id.* § 1.1. Section 3.5, in turn, provides that BMS "shall cause to be kept at the office of the Trustee a register (the register maintained in such office and in any other office or agency

5

designated . . . being herein sometimes referred to as the 'Security Register') in which, . . . [BMS] shall provide for the registration of Securities and of transfers of Securities." *Id.* § 3.5(a). The CVR Agreement defines "Majority Holders," meanwhile, as "Holders of at least a majority of the Outstanding CVRs" at "the time of determination." *Id.* § 1.1. Further, Section 1.4, which governs "Acts of Holders," provides that such acts "may be embodied in and evidenced by one or more instruments . . . signed by such Holders in person or by an agent duly appointed in writing" and that BMS "may set a record date for purposes of determining the identity of Holders entitled to vote or consent to any action by vote or consent authorized or permitted under this CVR Agreement." *Id.* § 1.4(a). "No such vote or consent shall be valid or effective for more than one hundred twenty (120) days after such record date." *Id.* If no record date is set, "the record date . . . shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company." *Id.* Section 1.4 also provides that "[t]he fact and date of the execution by any Person of any such instrument or writing may be proved in any reasonable manner which the Trustee deems sufficient," *id.* § 1.4(b), and that "[t]he ownership of Securities shall be proved by the Security Register. Neither the Company nor the Trustee . . . shall be affected by any notice to the contrary," *id.* § 1.4(c).

Finally, Section 1.16 governs termination of the Agreement. It states, first, that the "CVR Agreement will, automatically and without any further action of any Party, terminate and be of no force or effect, and the Parties hereto shall have no liability or obligations hereunder, . . . if as of the end of the day on the Initial Milestone Target Date, either the [Liso-cel] Milestone or the Ozanimod Milestone has not occurred." *Id.* § 1.16. That said, it further provides "that (A) Sections 1.5, 1.6, 1.7, 1.8, 1.9, 1.10, 1.12, 1.13, 4.7, 7.5, 7.9, 7.10, Article 8, this Section 1.16 and Section 1.1 (to the extent related to the foregoing) shall survive termination of this CVR

Agreement in accordance with their terms; and (B) the termination of this CVR Agreement shall not relieve any Party of any liability arising from any material breach of its obligations under this CVR Agreement occurring prior to the Termination Date." *Id.*

### B.  UMB I

In or about November 2020, some CVR investors grew increasingly concerned that BMS would miss the milestone deadlines.  In anticipation of that possibility, and litigation that might follow, some CVR investors, UMB, and the existing Trustee, Equiniti, began discussing the replacement of Equiniti with UMB as Trustee.  *UMB I*, 2024 WL 4355029, at *3.  (UMB was perceived by some investors to be better suited to bring litigation as a trustee.  *Id.*)  On December 18, 2020, UMB delivered a document to BMS and Equiniti labeled an "Instrument of Removal, Appointment and Acceptance," which purported to reflect an "act of the Majority Holders" under the CVR Agreement to remove Equiniti and appoint UMB, as trustee.  Compl. ¶ 13.

In the meantime, the December 31, 2020 milestone deadline for Liso-cel passed without FDA approval.  Compl. ¶ 15.  The next day, BMS announced in a press release that "the [CVR] Agreement . . . terminated automatically in accordance with its terms and the CVRs are no longer eligible for payment under the CVR Agreement."  *Id.* ¶ 17.  BMS then moved, over UMB's objection, to instruct the New York Stock Exchange ("NYSE") to delist the CVRs based on its view that "all rights pertaining to the CVRs were extinguished by the automatic termination of the CVR Agreement in accordance with its terms."  *Id.* ¶ 18.  BMS also directed the DTC to "delete its entire position" of CVRs from its electronic system on January 11, 2021, based on its view that the CVRs were "void" and "worthless."  *Id.* ¶ 19.  DTC complied with BMS's direction, which meant that CVR holders could no longer go to the DTC as registered CVR Holders to obtain present day authorizations.  *Id.*

On March 4, 2021, UMB notified BMS that BMS was in default under the CVR Agreement "because, among other things, [it] had breached its obligations to use Diligent Efforts to achieve the Liso-cel Milestone and had delisted the CVRs with the NYSE." *Id.* ¶ 127; *see* CVR Agrmt. § 8.1(b) (requiring a notice "specifying [any] default or breach and requiring it to be remedied" to be given "to the Company by the Trustee or to the Company and the Trustee by the Majority Holders").  After ninety days passed without BMS curing the alleged defaults, *see* CVR Agrmt. § 8.1(b) (establishing a ninety-day cure period after notice is given before suit can be brought), UMB filed suit on June 3, 2021, *see* Compl. ¶ 24.  Several months into discovery, however, BMS discovered that UMB had not obtained authorization for the "Instrument of Removal, Appointment and Acceptance" from the DTC, which, through its nominee Cede & Co., was the registered holder of over 99% of CVRs.  That is, DTC did not execute the instrument purporting to effect the substitution, and no omnibus proxy from DTC was procured. *UMB I*, 2024 WL 4355029, at *3-4.  Thereafter, BMS moved to dismiss *UMB I* for lack of subject-matter jurisdiction, arguing that, at the time the lawsuit was filed, UMB lacked standing because Equiniti had not properly been removed as Trustee and UMB had not properly been appointed as successor Trustee.  Compl. ¶ 26.

By April 17, 2024, while BMS's motion to dismiss was pending before the Court, a majority of CVR holders who held CVRs as of both December 9, 2020, and December 18, 2020, obtained proxies (or DTC confirmations) to assert all the rights of Cede & Co., as the DTC's nominee and the Holder on the Security Register.  *Id.* ¶ 41.  CVR holders asked their prime brokers or other CVR custodians who are the DTC participants to send instruction letters to the DTC asking it to cause Cede & Co. to authorize the CVR holders to take any and all actions that Cede & Co. was able to take under the CVR Agreement as of December 9, 2020, and December

18, 2020. *Id.* The DTC complied with these instructions and returned the signed proxy letters from Cede & Co. to the DTC participants, who then returned them to the relevant CVR holders. *Id*. Even after April 14, 2024, UMB continued to receive additional Confirmations and ultimately filed Confirmations from Holders of 392,525,875 CVRs (or 52.76% of outstanding CVRs) as of December 9, 2020, and 394,630,734 CVRs (or 53.05% of outstanding CVRs) as of December 18, 2020. *Id*. ¶¶ 43-44.

On September 30, 2024, the Court granted BMS's motion to dismiss *UMB I. See UMB I*, 2024 WL 4355029, at *13. The parties did not dispute that "only a properly appointed Trustee would have standing to bring" the lawsuit and that UMB's standing to bring suit thus "turn[ed] on whether it was (or is) the Trustee because it was not itself a beneficial CVR owner and, thus, [had] no independent stake in the controversy." *Id.* at *5. The Court held that "because UMB's appointment was not made by 'an act of the Majority Holders' as that term is defined in the CVR Agreement, it [had] not [been] properly appointed as Trustee prior to filing this lawsuit." *Id.* at *6. The CVR Agreement's plain terms permit removal of a Trustee and appointment of a successor Trustee only by an "act of the Majority Holders," CVR Agrmt. § 4.10(c), where a "Holder" is defined as "a Person in whose name a Security is *registered* in the Security Register." *Id.* § 1.1 (emphasis added). The sole instrument purporting to remove Equiniti and install UMB, however, was endorsed only by the CVR's *beneficial* owners and not DTC, which was the Registered Holder for 99% of the CVRs. As a result, "UMB was not validly appointed as successor Trustee under the CVR Agreement before it filed the lawsuit, so it lacked Article III standing at the time it filed suit." 2024 WL 4355029, at *13. The Court accordingly dismissed UMB's claims for lack of subject-matter jurisdiction.

The Court's dismissal of the initial suit was "*without prejudice* to the refiling of a new lawsuit by a properly appointed Trustee." *Id.* at *14. The Court observed that "any new lawsuit would likely have to confront the question of who the Trustee is now — namely, whether it is still Equiniti or, as a result of the 'reconfirmation' process earlier [in 2024], whether it is *now* UMB." *Id.* Leaving that jurisdictional question "for another day," the Court stated that "[a]ssuming that any such new lawsuit were to survive jurisdictional challenge, the Court would likely pick up where this case left off in terms of motions practice, discovery, and the like." *Id.* at *14 & n.5. Shortly thereafter, UMB filed this lawsuit. *See* ECF No. 1. In the operative Amended Complaint, UMB repeats its allegations that BMS breached the CVR Agreement by failing to use "Diligent Efforts" to achieve the first milestone. Compl. ¶¶ 134-42. It also adds claims for breach of contract and breach of the implied covenant of good faith and fair dealing for BMS's failure to maintain the Security Register following termination. *Id.* ¶¶ 143-64.

## DISCUSSION

As noted, BMS moves for dismissal of the Complaint pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction and pursuant to Rule 12(b)(6) for failure to state a claim. *See* ECF No. 51. The Court begins, as it must, with the issue of subject-matter jurisdiction. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

### A. Motion to Dismiss for Lack of Subject-Matter Jurisdiction

Article III of the Constitution "restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'" *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). "That case-or-controversy requirement is satisfied only where a plaintiff has standing" to bring suit, which requires the plaintiff to "adequately establish," among other things, "an injury in fact (*i.e.*, a 'concrete and particularized' invasion of a 'legally protected interest')."

*Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  And significantly, Article III standing is a threshold requirement that must be met at the outset of a case.  *See Lujan*, 504 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of suit.").  Separate and apart from *Article III* standing, a plaintiff must generally also have "*prudential* standing," a requirement that "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves."  *Patterson v. Patterson*, No. 20-CV-2552 (PMH), 2022 WL 356513, at *4 (S.D.N.Y. Feb. 7, 2022) (quoting *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 40 (2d Cir. 2015)) (emphasis added).  When considering a motion to dismiss for lack of subject-matter jurisdiction, a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Morrison*, 547 F.3d at 170 (cleaned up).

In resolving the present motion, the Court "pick[s] up where this case left off."  *UMB I*, 2024 WL 4355029, at *14 n.5.  That is, it must address "the question of who the Trustee is now — namely, whether it is still Equiniti or, as a result of the 'reconfirmation process' earlier [in 2024], whether it is *now* UMB."  *Id.* at *14.  As discussed, UMB alleges that it has properly been appointed Trustee now that the CVR holders have obtained proxies from Cede & Co. for UMB's appointment as Trustee as of both December 9 and 18, 2020.  In response, BMS presses three arguments for why UMB could not be retroactively installed as the successor Trustee.  The Court will discuss each of these arguments in turn.

Two of BMS's jurisdictional challenges require little discussion.  BMS argues first that, under the CVR Agreement, the effectiveness of the beneficial owner signatures that were compiled in the "Instrument of Removal, Appointment and Acceptance" lapsed by no later than

April 17, 2021, which was "one hundred twenty (120) days" after the Instrument was delivered to BMS on December 18, 2020.  Defs.' Mem. 13; *see* CVR Agrmt. § 1.4(a) ("No such vote or consent shall be valid or effective for more than one hundred twenty (120) days after such record date.").  Because those signatures expired in 2021, BMS asserts, they cannot be retroactively validated by DTC proxies obtained more than three years later.  That is wrong.  Section 1.4(a) sets an expiration date for votes taken by "Persons who were Holders of Securities."  CVR Agrmt. § 1.4(a).  And as the Court previously held, the beneficial holders were not "Holders" within the meaning of the CVR Agreement.  Accordingly, their December 2020 signatures — and the 2020 Instrument of Removal — had no effect.  *See UMB I*, 2024 WL 4355029, at *6-7.  It follows that Section 1.4(a)'s 120-day deadline has no relevance to Cede & Co.'s retroactive authorizations of the beneficial holder's signatures in 2024.

Second, BMS objects that UMB "has not shown an 'act' by a 'majority of Holders' through beneficial owner signatures for whom the DTC retroactively provided its proxy" because UMB's arithmetic is faulty.  Def.'s Mem. 15.  But that argument fares no better.  As UMB spells out in detail in its opposition, "UMB's appointment was confirmed by Holders by 52.76% of CVRs as of December 9, 2020, and of 53.05% of CVRs as of December 18, 2020."  ECF No. 60 ("Pl.'s Opp'n"), at 17.  Rather than dispute these figures, BMS's reply asserts only that UMB relies on "untested factual assertions" and that the issue warrants additional discovery.  *See* ECF No. 65 ("Def.'s Reply"), at 7.  Without more, therefore, BMS's second objection fails to provide a basis to dismiss at this stage of the litigation.

BMS's third and final jurisdictional challenge requires more discussion, but it ultimately falls short as well.  BMS argues that UMB could not validly replace Equiniti as Trustee because Section 4.10 of the CVR Agreement — which governs appointment of a successor trustee — was

terminated on January 1, 2021, when the CVR Agreement terminated automatically. *See* CVR Agrmt. § 1.16; *see also* ECF No. 52 ("Def.'s Mem."), at 13-14. It is undisputed that when the Liso-cel milestone deadline passed, the CVR Agreement "automatically terminated" pursuant to Section 1.16 of the Agreement. The dispositive question, then, is whether Section 4.10 was terminated along with the CVR Agreement or whether it survived such termination.

Under ordinary principles of contract construction, "agreements are construed in accord with the parties' intent. The best evidence of that intent is the parties' writing." *Marin v. Const. Realty, LLC*, 71 N.E. 3d 530, 533 (N.Y. 2017) (cleaned up). Accordingly, courts may not "by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010). To that end, "it is a recognized rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D. 2d 191, 196 (N.Y. App. Div. 1st Dep't 1995) (cleaned up). In short, "a contract should be read as a whole, . . . and if possible it will be so interpreted to give effect to its general purpose." *Marin*, 71 N.E. 3d at 534 (cleaned up).

Here, the CVR Agreement includes a survival clause in Section 1.16, which lists several provisions that survive termination of the Agreement. It provides that "Sections 1.5, 1.6, 1.7, 1.8, 1.9, 1.10, 1.12, 1.13, 4.7, 7.5, 7.9, 7.10, Article 8, this Section 1.16 and Section 1.1 (to the extent related to the foregoing) shall survive termination of this CVR Agreement in accordance with their terms." CVR Agrmt. § 1.16. Notably, Section 4.10 is missing from this list. Because "[t]he clear and unambiguous provision of a set of terms in a contract should imply the exclusion of non-listed terms," *HealthPro Bioventures, LLC v. Prometic Life Scis. Inc.*, No. 10-CV-3295

(DLC), 2011 WL 5419706, at *7 n.17 (S.D.N.Y. Nov. 8, 2011) (citing *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003) ("[W]e are not free to alter the plain terms of an agreement or to strain language beyond its reasonable and ordinary meaning.")), BMS argues that Section 4.10 plainly does not survive termination of the Agreement. In response, UMB argues that Section 4.10 survives by implication because it is necessary to effectuate Article 8 of the Agreement, which the survival clause expressly saves from termination. *See* Pl.'s Opp'n 13-17.

Although a close call, the Court concludes that UMB has the better of the argument. As a threshold matter, the Court rejects UMB's claim that BMS's argument is barred by the doctrine of judicial estoppel. *See* Pl.'s Opp'n 16-17. That doctrine provides that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680 (1895)). When determining whether to invoke judicial estoppel, courts consider three non-exhaustive factors: (1) whether a party's later position is "'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750-51 (cleaned up).

Here, UMB's judicial estoppel argument rests on a statement BMS's counsel made at oral argument in *UMB I*. *See* ECF No. 44-15 ("Tr."), at 72-73. When the Court asked BMS's counsel which entity would refile the action if the case was dismissed without prejudice, BMS's counsel replied that "Equiniti is [T]rustee, Equiniti could choose to resign," and "that would invoke the provisions of Section 4.10." *Id.* at 72. He proceeded to explain that Section 4.10 "is not expressly carved out of the termination . . . , but Article VIII is, and there's no way to apply Article VIII without going through Section 4.10 if Equiniti were to resign." *Id.* at 72-73. In other words, at the time, BMS's counsel adopted the exact position that UMB now presses (and that BMS now opposes). BMS concedes as much, noting in its reply memorandum of law that "BMS's counsel was mistaken in suggesting at oral argument that a post-termination trustee resignation would invoke the provisions of Section 4.10." Def.'s Reply 6 n.6 (cleaned up).

Although BMS has adopted a clearly inconsistent position, the Court concludes that judicial estoppel does not apply here because the Court's prior ruling left the issue unresolved. *See UMB I*, 2024 WL 4355029, at *14 (observing that "the question of who the Trustee is now — namely, whether it is still Equiniti or, as a result of the 'reconfirmation' process earlier this year, whether it is *now* UMB" is "a question for another day"). BMS accordingly did not successfully persuade the Court of its prior position and would not derive an unfair advantage if not estopped. *See* Def.'s Reply 6 n.6 ("The hypothetical being discussed in that part of the argument had no apparent bearing on the Court's dismissal decision.").

Even so, the Court is ultimately persuaded — as BMS's counsel once was — that "there's no way to apply Article VIII without going through Section 4.10 if Equiniti were to resign," Tr. 72-73, and that Section 4.10 accordingly must survive by implication. As discussed, Article 8 allocates authority to the Trustee to "bring suit to protect the rights of the Holders,"

including in the event of default.  CVR Agrmt. § 8.1.  Article 8 thus assumes the existence of a Trustee capable of enforcing the CVR Agreement.  Section 4.10, on the other hand, governs the resignation, removal, and replacement of the Trustee.  *See id.* § 4.10.  And as UMB points out, "[i]f Section 4.10(c), which governs the Trustee's appointment, did not survive, the Trustee could go out of business, resign, or act against the Holders' interests with no means for the Majority Holders (or anyone else) to replace it," Pl.'s Opp'n 16, rendering the enforcement provisions of Article 8 ineffectual.

True, Section 4.10 is not listed in the Agreement's survival clause, but that omission is not fatal to UMB for two reasons.  For one thing, Section 1.16 itself contemplates that non-listed Agreement provisions may survive termination.  It caveats that "the termination of this CVR Agreement shall not relieve any Party of any liability arising from any material breach of its obligations under this CVR Agreement occurring prior to the Termination Date."  CVR Agrmt. § 1.16.  Thus, the text of Section 1.16 itself does not unambiguously support BMS's view that only the listed terms and no other terms in the Agreement would survive termination.  *See, e.g.*, *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1062-63 (9th Cir. 2020) (refusing to interpret a survival clause strictly to exclude a non-listed term because, "[l]ooking to the Agreements as a whole," "[o]ther provisions of the Agreements . . . suggest ambiguity about the survival clause"); *Huffman v. Hilltop Cos., LLC*, 747 F.3d 391, 397 (6th Cir. 2014) (reading a contract as a whole to conclude that "the parties did not clearly intend for the survival clause to serve as an exhaustive list of the provisions that would survive expiration of the agreement").

Second, BMS's reading is inconsistent with the Trust Indenture Act, the requirements of which the CVR Agreement expressly incorporates.  Specifically, Section 1.7 of the CVR Agreement provides that the Trust Indenture Act trumps any conflicting provision of the CVR

Agreement: "If any provision hereof limits, qualifies or conflicts with another provision which is required or deemed to be included in this CVR Agreement by any of the provisions of the Trust Indenture Act, such required or deemed provision shall control."  CVR Agrmt. § 1.7.  As relevant here, the Trust Indenture Act requires that there be a "qualified" trustee "at all times." 15 U.S.C. § 77jjj(a)(1).  Section 4.10 ensures that a successor Trustee can be appointed in the event of resignation, removal, or another event.  It follows, then, that the Trust Indenture Act — and Section 1.7 of the CVR Agreement — require the continued operation of Section 4.10.

BMS's response is unpersuasive.  It argues that Article 8 functions without Section 4.10 because the Trust Indenture Act supplies its own procedures for appointing a successor Trustee. According to BMS, if a post-termination Trustee were to "go out of business" or "resign," Def.'s Reply 6, Section 77jjj(b) of the Act would require BMS to appoint a successor and the outgoing trustee would serve until replaced.  The problem is that the Trust Indenture Act says no such thing.  Section 77jjj(b) does not state that BMS would appoint a replacement.  Instead, it provides only that, in the event a trustee has "a conflicting interest" — a scenario this case does not present — "the obligor upon the indenture securities shall take prompt steps to have a successor appointed *in the manner provided in the indenture*," 15 U.S.C. § 77jjj(b)(i) (emphasis added) — i.e., in accordance with Section 4.10.  In other words, the Trust Indenture Act itself assumes the existence of contractual procedures for replacement of a trustee.

For these reasons, the Court concludes that BMS's motion to dismiss for lack of subject-matter jurisdiction falls short and that UMB has standing to bring this new lawsuit.

## B.  Motion to Dismiss for Failure to State a Claim

That leaves BMS's arguments for dismissal under Rule 12(b)(6) for failure to state a claim.  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept[]

all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff fails to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

BMS moves to dismiss all five counts in UMB's Complaint. The Court will begin by addressing BMS's arguments for dismissing Counts I and II, before addressing Counts III through V — all of which relate to the actions BMS took to delist the CVRs — in tandem.

BMS's arguments for dismissal of Counts I and II are easily rejected. BMS moves to dismiss Count I — which requests a declaratory judgment that "UMB is the Trustee under the CVR Agreement" and "Equiniti is no longer the Trustee under the CVR Agreement," Compl. ¶ 133 — for the same reasons it asserted in support of its motion to dismiss for lack of subject-matter jurisdiction. *See* Def.'s Mem. 25. Having already rejected those reasons above, the Court denies BMS's motion to dismiss Count I of the Complaint. The Court also denies BMS's motion to dismiss Count II — UMB's breach of contract claim for failure to use diligent efforts, *see* Compl. ¶¶ 134-42 — which rests on BMS's claim there has been no Event of Default that would permit a trustee to sue. *See* Def.'s Mem. 22-25. The Court squarely rejected these arguments in

its June 24, 2022 Memorandum Opinion and Order resolving BMS's Rule 12(b)(6) motion to dismiss in *UMB I*, *see UMB Bank N.A. v. Bristol-Myers Squibb Co.*, No. 21-CV-4897 (JMF), 2022 WL 2290609 (S.D.N.Y. June 24, 2022) (ECF No. 33); *see also* Def.'s Mem. 23 ("acknowledg[ing] the Court's previous interlocutory ruling that termination of the CVR Agreement does not prevent a post-termination notice of default from maturing into an 'Event of Default'"), and sees no reason to revisit that ruling here.

The rest of BMS's arguments are aimed at Counts III, IV, and V of the Complaint, which stem from the post-termination actions that BMS took to delist and deregister the CVRs. Specifically, these claims revolve around UMB's allegations that, "[b]y delisting the CVRs from the NYSE and directing the DTC to delete its participant electronic trading system, [BMS] frustrated the ability of individual CVR holders to obtain proxies from the DTC" and exercise their "rights to enforce the CVR Agreement." Compl. ¶¶ 151-52. The Court considers each of BMS's arguments for dismissal in turn.

First, against all three Counts, BMS objects that UMB did not deliver the requisite Notices of Default. *See* Def.'s Mem. 21-22. That is, although UMB's 2024 Notice of Default alleged a breach of BMS's "obligations to use Diligent Efforts," it did not include notice that BMS had breached its obligations under Section 3.5 to maintain the Security Register (Count III), that BMS breached the implied covenant of good faith and fair dealing (Count IV), or that any condition precedent of the CVR Agreement requiring a beneficial holder to obtain a proxy from the Registered Holder was excused (Count V). *Id.* The Court concludes, however, that the CVR Agreement does not require UMB to provide separate notice of Counts III, IV, and V. *See* Pl.'s Opp'n 24-25. Where "an Event of Default has occurred," Section 8.4 of the CVR Agreement authorizes the Trustee to "protect and enforce its rights and the rights of the Holders

under this CVR Agreement by such appropriate judicial proceedings *as the Trustee shall deem most effectual* to protect and enforce any of such rights, . . . *whether for the specific enforcement of any covenant or agreement contained in this CVR Agreement or in aid of the exercise of any power granted in this CVR Agreement . . . .*"  CVR Agrmt. § 8.4 (emphasis added).  Here, UMB delivered notice of its claim that an Event of Default based on BMS's Diligent Efforts breach had occurred.  Section 8.4 thus accords UMB broad discretion to assert the claims it deems "most effectual" to "protect and enforce . . . the rights of the Holders," *id.*, which in this case includes Counts III, IV, and V.  BMS leaves this argument unanswered on reply and cites no authority that an Event of Default must be noticed for every additional claim a Trustee asserts.  BMS's notice argument thus fails.

Second, as to Count III, BMS argues that it cannot be liable under Section 3.5(a) of the CVR Agreement for failure to maintain the Security Register because Section 3.5(a) is not listed in Section 1.16's survival clause, and therefore did not survive termination of the CVR Agreement.  Def.'s Mem. 17-18.  In response, UMB argues that Section 3.5 is yet another Agreement provision saved by implication because it too is necessary to effectuate Article 8's enforcement provisions.  This time around, however, the Court concludes that BMS has the better of the argument.  According to UMB, the Majority Holders cannot act to direct a Trustee to enforce their rights under Article 8 — and oversee post-termination litigation — without a Security Register reflecting who those Holders are.  *See* Pl.'s Opp'n 19.  But as BMS points out, "[i]f . . . an Event of Default existed that empowered [the Trustee] to sue, then the conduct of such post-termination litigation could be overseen by 'Majority Holders' as of the termination date, December 31, 2020 — the records for which are available in the DTC system.  The same Holders also would receive any recovery."  Def.'s Mem. 18 (internal citation omitted).  Article

20

8's enforcement provisions thus remain effective even in the event of Section 3.5(a)'s termination.

UMB's responses are unavailing.  UMB contends first that BMS's reading lacks support in the CVR Agreement, *see* Pl.'s Opp'n 19, but the exclusion of Section 3.5 from the Agreement's survival clause is exactly what supports BMS's argument.  *See HealthPro Bioventures, LLC*, 2011 WL 5419706, at *7 n.17 ("The clear and unambiguous provision of a set of terms in a contract should imply the exclusion of non-listed terms.").  In other words, it is UMB's burden to demonstrate that Section 3.5 survives, despite the express terms of the CVR Agreement's survival clause.  UMB's only other contention is that BMS's reading is "inconsistent with BMS's own Rule 12(b)(1) motion because December 2020 Holders *have* acted to confirm UMB as Trustee to oversee the litigation, yet BMS *objects* on myriad baseless grounds."  Pl.'s Opp'n 19.  The Court, however, has already rejected those "baseless grounds" and agreed with UMB that the December 2020 Holders have acted to confirm UMB as Trustee. For these reasons, BMS's motion to dismiss Count III of the Complaint must be and is granted.

BMS suggests that dismissal of Count III based on the termination of Section 3.5(a) necessitates the dismissal of Counts IV and V, which UMB pleads in the alternative.  *See* Def.'s Mem. 19.  The Court agrees as to Count V, which "requests a declaratory judgment that any condition precedent of the CVR Agreement that would require a beneficial holder to obtain a proxy from the Registered Holder to act under the CVR Agreement is excused," Compl. ¶ 164, based on allegations that BMS "caus[ed] the DTC to delete its participant electronic trading system," which "thwarted and frustrated the ability of CVR beneficial holders to satisfy this condition precedent after January 2021."  *Id.* ¶ 161.  UMB essentially concedes that the claim it asserts in Count V hinges on its Count III argument that Section 3.5(a) is necessary for Article

8's enforcement provisions; it states in its opposition that "BMS's position that the 'Holder requirement' is necessary for action under the CVR Agreement is precisely *why* either Section 3.5(a) must survive or compliance with the 'Holder requirement,' whose satisfaction BMS has precluded, must be excused." Pl.'s Opp'n 21 (citation omitted). In dismissing Count III, however, the Court concluded that BMS has not precluded compliance with the "Holder requirement" because post-termination litigation can be overseen by Majority Holders as of the termination date — the precise reason why UMB now has standing to bring this action. BMS's motion to dismiss Count V of the Complaint is therefore granted as well.

That leaves Count IV of the Complaint, which asserts breach of the implied covenant of good faith and fair dealing based on BMS's delisting of the CVRs. Here too, BMS argues that dismissal of Count IV follows directly from the dismissal of Count III because "[n]o duty can be implied under . . . terminated provisions." Def.'s Mem. 19. The Court disagrees. In addition to the express terms of a contract, New York law implies in every contract a covenant of good faith and fair dealing "pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006). This covenant "includes an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Kader v. Paper Software Inc.*, 111 F.3d 337, 342 (2d Cir. 1997) (cleaned up). That said, the covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (cleaned up).

In this case, UMB alleges that, "[b]y delisting the CVRs from the NYSE and directing the DTC to delete its participant electronic trading system, [BMS] frustrated the ability of individual CVR holders to obtain proxies from the DTC."  Compl. ¶ 152.  It alleges further that these actions were "taken in bad faith to thwart the CVR holders' rights in the face of imminent litigation and breached the duty of good faith and fair dealing."  *Id.* ¶ 153.  Unlike Count III, Count IV does not hinge on the survival of Section 3.5(a) of the CVR Agreement because the implied covenant survives with the remainder of the Agreement.  *See Dorset Indus. Inc. v. United Grocers, Inc.*, 893 F. Supp. 2d 395, 406-08 (E.D.N.Y. 2012) ("New York does not require that a breach of the duty of good faith and fair dealing be tied to a *specific* contractual provision." (emphasis added)).  Indeed, "[w]hen the implication of a duty of good faith and fair dealing would be inconsistent with the language of a provision of a contract and is not necessary to make the agreement meaningful, the court will not invoke the covenant.  But where, by contrast, it is necessary to read an obligation of good faith in order to avoid rendering a contract promise illusory . . . the courts will not hesitate to infer an obligation to act in good faith."  *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021).  Here, BMS has neither demonstrated that UMB's implied covenant claim is inconsistent with the terms of the CVR Agreement, nor that it adds any substantive provisions not included by the parties.  To the contrary, the sum and substance of UMB's implied covenant claim is that BMS's instructions to DTC to delist the CVRs "was designed to and had the effect of impairing Holder rights to act under the Agreement" and "Holders' ability to enforce the Agreement pursuant to Article 8, which indisputably survives."  Pl.'s Opp'n 20.  The Court's dismissal of Count III accordingly does not necessitate dismissal of Count IV.  In the end, "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the

facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Janel World Trade, Ltd. v. World Logistics Servs., Inc.*, No. 08-CV-1327 (RJS), 2009 WL 735072, at *13 (S.D.N.Y. Mar. 20, 2009) (Sullivan, J.) (denying a motion to dismiss the plaintiffs' claim for breach of the implied covenant on that basis).  Thus, BMS's motion to dismiss Count IV of the Complaint must be and is denied.

Accordingly, BMS's motion to dismiss for failure to state a claim is granted as to Counts III and V of the Complaint, but denied as to all other counts.

## CONCLUSION

In sum, the Court denies BMS's motion to dismiss for lack of subject-matter jurisdiction and grants in part and denies in part BMS's motion to dismiss for failure to state a claim. Specifically, Counts III and V are dismissed, but the other claims survive.  Unless and until the Court orders otherwise, BMS shall file its Answer to UMB's surviving claims within **three weeks** of the date of this Opinion and Order.  *See* Fed. R. Civ. P. 12(a)(4)(A).  By separate Order to be entered today, the Court will schedule an initial pretrial conference.

The Clerk of Court is directed to terminate ECF No. 51.

SO ORDERED.

Dated: December 1, 2025
New York, New York

_____
JESSE M. FURMAN
United States District Judge